# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Geraldine Soat Brown | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 6261 | **DATE** | 7/19/2002 |
| **CASE TITLE** | | Chen vs. Mayflower | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons set out in the Memorandum Opinion and Order, the motion of defendant Mayflower Transit, Inc. for summary judgment on the pendant state law counts of the second amended complaint [72-1] is granted in part and denied in part. The motion is granted as to Counts II and IV of the Second Amended Complaint, and judgment is entered in favor of Mayflower and against the plaintiff on Counts II and IV. The motion is denied as to Count III of the Second Amended Complaint.

*Geraldine Soat Brown*

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | number of notices | | Document Number |
|---|---|---|---|---|---|
| | No notices required. | | | | |
| X | Notices mailed by judge's staff. | | JUL 22 2002 | | |
| | Notified counsel by telephone. | | date docketed | | |
| | Docketing to mail notices. | | | docketing deputy initials | |
| | Mail AO 450 form. | | | | |
| | Copy to judge/magistrate judge. | | | | |
| tw | courtroom deputy's initials | | date mailed notice | | |
| | | Date/time received in central Clerk's Office | | mailing deputy initials | |

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

ANGIE CHEN,  )
    **Plaintiff/Counter Defendant,**  )    **Cause No. 99 C 6261**
      )
v.  )    **Magistrate Judge Geraldine Soat Brown**
      )
MAYFLOWER TRANSIT, INC.,  )
    **Defendant/Counter Plaintiff.**  )
      )
      )
      )

## MEMORANDUM OPINION AND ORDER

This case comes before the Court on the motion of defendant Mayflower Transit, Inc. for

summary judgment on the pendent state law counts of the second amended complaint [Dkt # 72]:

intentional infliction of emotional distress (Count III), negligent infliction of emotional distress

(Count IV), and conversion (Count II). For the reasons that follow, defendant's motion is

GRANTED IN PART AND DENIED IN PART.

## FACTUAL BACKGROUND[1]

In 1999, plaintiff Angie Chen, a 1997 graduate of the University of Michigan Law School

and an associate at an Atlanta, Georgia, law firm, decided to move to Chicago, Illinois.[2] In late May

---

[1] The following facts are taken from the parties' respective statements filed pursuant to Local Rule 56.1, which are cited herein as "Def.'s Stmt." [Dkt # 74] and "Pl.'s Stmt." [Dkt #78], and from the exhibits submitted with those statements.

[2] Chen took the Georgia bar examination in February 1998 and received her license to practice law in August, 1998. (Chen Dep. 121-22.)

1999, Chen contacted Admiral Movers, a local agent of defendant Mayflower Transit, Inc. ("Mayflower").

On June 4, 1999, an estimator came to Chen's apartment to inspect her property and determine the cost of the move based on factors including the weight and volume of the property, and the fact that there were stairs at the point of origin and an elevator at the destination. (Def.'s Stmt., Ex. B.) On the same day, Chen signed an estimate which states that the cost of the move was "guaranteed not to exceed" $1,741.89. (*Id.*) A portion of the estimate also states, "If this shipment is a binding estimate, then this amount covers only the services and quantities shown in the estimate. If items are added to the shipment or additional services are performed, additional costs may result."[3] (*Id.*) Chen claims that the Admiral Movers representative told her that the cost of the move could not go above $1,741.89, and could only go lower. (Chen Dep. at 197.) The method of payment was not discussed on June 4. (Chen Dep. at 183-84, 187-92.) A section of the estimate, however, reads, "Unless credit approval is completed in advance of shipment, all monies must be paid in U.S. funds, by cash, cashier's check, certified check or money order at or before the time of delivery." (Def.'s Stmt., Ex. B.) The estimator also gave Chen a packet of printed materials including a brochure entitled "'What Does This Mean?' Mayflower's Glossary of Moving Terms," which defined C.O.D. as "cash on delivery" and stated that "[f]or C.O.D. shipments, payment is required in cash or by traveler's check, money order, cashier's check or credit card. If you use a credit card, you must

---

[3] The Estimate further states in part: "If this shipment is a non-binding estimate, then this amount covers only the articles and services listed in the estimate. It is not a guarantee that the actual charges will not exceed the amount of the estimate. . . . If the total charges for the listed articles and services exceed the amount of the non-binding estimate . . . by more than ten percent, then, upon your request, the carrier must relinquish possession of your shipment upon payment of the estimate plus ten percent, plus payment in full for any services not shown in the estimate." (Def.'s Stmt., Ex. B.)

arrange this with your origin agent because authorization is required before loading commences."
(Def.'s Stmt., Ex. C.)

On or about June 8, Chen received a form letter from Admiral Movers/Mayflower that confirmed a range of dates for the loading and delivery of her household items and personal property. (Def.'s Stmt., Ex. D.)[4] The letter states: "PAYMENT is due at the time of delivery and can be made in CASH, CERTIFIED CHECK or MONEY ORDER, or a Major Credit Card, or DIRECT BILLING to company with approved LETTER OF AUTHORIZATION and APPROVED CREDIT CHECK. If you choose to change your payment plan, we ask that you notify our office within 5 working days of your actual move date." (*Id.*, capitalization in original.) Chen testified that she decided to pay by major credit card upon receiving this letter. (Chen Dep. at 203.) The letter did not mention any requirement that Chen seek pre-approval for her credit card. (Def.'s Stmt., Ex. D.) The letter also contained no reference to the particular card or credit card number to be used by Chen. (*Id.*)

On June 10, Admiral Movers arrived at Chen's Atlanta apartment to load her belongings. (Chen Dep. at 212.). On that day, Admiral Movers gave Chen a Bill of Lading that listed the total estimate as $1,741.89, and had "COD" written along with the handwritten total. (Def.'s Stmt., Ex. F.) Chen also received a Certificate and Statement of Additional Services. (Def.'s Stmt., Ex. G.) The parties dispute whether Chen received on that day a typed estimate indicating that the method of payment was "C.O.D." (Def.'s Stmt., Ex. E.)[5] Both the Bill of Lading and the typed estimate indicate that, as of June 10, 1999, the estimate was binding. (Def.'s Stmt., Exs. E, F.)

---

[4] The letterhead describes Admiral Moving & Storage Co. Inc. as an agent for Mayflower Transit, Inc. (Def.'s Stmt., Ex. D.)

[5] Chen does not dispute that she received the document, she merely disputes the day and manner of receipt. (Second Am. Compl. ¶ 15.)

Chen and her brother left for Chicago with plans to meet the movers at Chen's new apartment in the Lincoln Park neighborhood of Chicago. (Chen Dep. at 191-92, 230-31.) Chen's property, which included her bar review materials for the July, 1999 Illinois bar examination (Def.'s Stmt., Ex. H at 8), was scheduled to arrive in Chicago between June 15 and June 21. (Def.'s Stmt., Exs. B, D.) June 21 arrived, but Chen's property did not. (Def.'s Stmt. ¶ 13.) Chen called Mayflower's "800" number to inquire about her goods' whereabouts, but Mayflower was unable to locate the shipment at that time. (Chen Dep. at 228.)

On June 30, Chen called Mayflower again to inquire about the location and estimated time of arrival of her property. (Chen Dep. at 230-34.) Chen asked about Mayflower's delay compensation policy because she was incurring costs of over $1,100 by staying at the Holiday Inn while she waited for her household items to be delivered. (*Id.*) Chen claims that she was told that the delay compensation policy capped the reimbursement amount at $900. (*Id.*) The same day, at approximately 9:00 a.m., Ann Vinyard[6] of Century Moving & Storage (a Lombard, Illinois, agent of Mayflower) called Chen to inform her that her shipment would arrive that day between 11:00 a.m. and 1:00 p.m. (*Id.* at 233-34.) A few minutes after Vinyard and Chen hung up, Vinyard called back to tell Chen that she would need cash or a cashier's check in the amount of $1,741.89. (*Id.* at 235.) Chen informed Vinyard that she would pay by credit card as authorized by the June 8 letter she had received from Mayflower. (*Id.*) Vinyard told Chen that the driver would not accept her credit card because it had not been pre-approved. (*Id.* at 236.)

---

[6] Chen spells Vinyard's name as "Vineyard" in her papers. For the purposes of this opinion, however, it is assumed that Mayflower's spelling is the correct one.

Faced with the prospect of raising nearly $2000 in cash when she had expected to pay by credit card, Chen explored several different avenues. First, she called Citibank, the issuer of her Visa card, and found out that she had enough credit to pay for the move, but that her cash advance limit was only $1400. (Chen Dep. at 237.) Chen went to a bank in her neighborhood, where the teller informed her that the bank did not perform cash advances on credit cards. (*Id.* at 238-39.) Chen claims that she decided against the cash advance route because she did not know of any Citibank branches in Chicago and she wanted to spend the short amount of time she had to attempt to raise the money by other means. (Chen Dep. at 239-40.) Chen then returned to her apartment to find out whether there were Chicago branches of First Union, the bank that had issued her ATM card. (*Id.* at 241-43.) She was told that there were no branches in Chicago. (*Id.* at 243.)

While Chen was in her apartment calling First Union, her brother mentioned a program he had seen on the Discovery Channel about criminal movers who demand cash at delivery; inflate the bill; charge customers for storage of the shipment; and, before releasing the goods to the customers, demand that they sign a statement approving the extra charges and releasing the mover from liability. (Chen Dep. at 244.) Chen then asked her brother to buy a tape recorder so that she could tape subsequent conversations with Mayflower. (Chen Dep. at 245.)

After her brother returned with the recording equipment, Chen called Vinyard. (Chen Dep. at 245-46.) Chen did not inform Vinyard that the conversation was being taped. (Chen Dep. at 247.) Chen described Vinyard's tone as civil and calm during that conversation, and acknowledged that Vinyard was never rude to her over the phone. (*Id.* at 246-47.) During this conversation, Chen informed Vinyard that the shipment contained "time-sensitive" and expensive bar review materials that Chen needed in order to pass the upcoming bar examination. (Def.'s Stmt., Ex. H at 8; Pl.'s

App. Ex. Opp. Def.'s Mot. Summ. J. ("Pl.'s App."), Ex. F at 110.) Vinyard told Chen that she was

not able to pay by credit card, and referred Chen to the portion of the estimate that stated that

payment by credit needed to be approved 5 days in advance. (Chen Dep. at 257-59; Def.'s Stmt.,

Ex. H at 16-17.) Vinyard also explained to Chen that her company (Century Moving) was "just the

hauling agent" with very limited power in the situation and that Chen would have needed to pre-

arrange credit card payment with Admiral Movers, the Mayflower agent at the point of origin of the

shipment. (Def.'s Stmt., Ex. H at 2, 6, 13, 16.) Vinyard also stated that, as the hauling agent,

Century could not allow the driver to unload without receipt of certified funds for the full amount

of the move, and that Admiral Movers had already authorized storage of the goods. (*Id.* at 16.)

At approximately 11:00 a.m., the driver of the truck arrived with Chen's household goods.

(Chen Dep. at 272.) When Chen went to the lobby to meet him, he told her that the truck was too

wide for the street and that if a shuttle truck was necessary, the bill would be twice as much. (*Id.*)

Chen claims that the truck could have fit on the street in front of her apartment because she had seen

another company's moving truck parked on her street approximately a week before. (*Id.* at 284-86.)

The driver parked the truck some distance away from the apartment, then walked back to Chen's

apartment to call Vinyard. (*Id.* at 300-01.) Chen overheard him telling Vinyard that he was parked

far away; that there were more than 90 boxes to move; that the elevator was extremely small; and

that the interior stairs were very narrow. (*Id.* at 301.)

The driver then handed the telephone to Chen, who discussed the new developments with

Vinyard. (*Id.* at 303.) This conversation was not taped. (*Id.* at 306.) Vinyard informed Chen that

due to the additional services required, such as a "long carry," the cost of the move had risen from

the quoted $1,741.89 amount to over $2,500. (*Id.* at 304.) Vinyard also said that unless Chen could

raise the $2,500 in cash, her goods would be put into storage and Chen would incur storage and redelivery costs. (*Id.* at 304.) Again, Vinyard's demeanor was neither hostile nor rude. (*Id.* at 304-05.) Chen again asked that Vinyard take her credit card, and Vinyard again refused. (*Id.* at 305.) Vinyard stated that she would call Chen back with information about the storage charges. (*Id.* at 306.)

At some point after this conversation, which ended around 11:30 a.m., Chen left her apartment to search for ATMs and to go to a "Money Gram" store to find out how a wire transfer of funds could be affected. (Chen Dep. at 270, 308-13.) Chen withdrew $1000 with her ATM cards. (*Id.* at 313.) At approximately 2:00 that afternoon, Chen called her father to ask him to wire her the funds, over $2,500, necessary for her items to be delivered that day. (*Id.* at 311.) Chen's father agreed to wire the money, but was unable to get away from work right away and asked Chen to keep the movers there as long as possible. (*Id.* at 311-12.)

At some time between 11:30 a.m. and 2:30 p.m., Chen also spoke with Corrine Swenson, a Mayflower customer service representative at the "800" number, in a recorded conversation. (Def.'s Stmt., Ex. H at 20-29.) Swenson told Chen that payment by credit card must be approved by the booking agent, *i.e.*, Admiral Movers, at least 48 hours before the goods are loaded. (*Id.* at 22.) Swenson further explained that Mayflower's process for credit card approval was "very complicated" and involved certain required paperwork, thus necessitating advance notice. (*Id.* at 25.) Swenson called Admiral Movers to see if they would approve Chen's credit card, but reported that they had refused. (*Id.* at 25.) Apparently, Vinyard had told Admiral Movers that Chen's cash advance on her credit card had not worked. (*Id.* at 26.) Swenson also told Chen that she would be reimbursed for her expenses for the delay in delivery up to the amount of the original estimate. (*Id.* at 27-29.)

Later on, Vinyard called Chen again to check on the progress of the move. (Def.'s Stmt., Ex. H at 29.) After Chen told her that she was working on getting the money together and had asked the driver to wait a while longer, Vinyard informed her that each additional hour would cost Chen $84.50. (*Id.* at 29, 33-34.) Vinyard further told Chen that her credit card would not be accepted because Admiral Movers was refusing to accept it and because the estimate stated that credit card payments needed to be arranged in advance. (*Id.* at 31-32.)

Vinyard also told Chen that she would need to sign an addendum approving additional charges including waiting time and long carries. (*Id.* at 30, 36.) In response to Chen's complaints about the additional charges, Vinyard pointed Chen to the portion of the estimate that indicated that the binding estimate does not include additional charges that may arise at the destination point. (*Id.* at 35; Def.'s Stmt., Ex. B.) Vinyard also reminded Chen that Admiral Movers had authorized storage and told her that the driver could not wait much longer; that there were overtime charges after 4:00 p.m.; and that "it's really racking up for you." (Def.'s Stmt., Ex. H at 34.) Chen stated that, while she would pay if she were able to raise the cash, she was not waiving her rights if it turned out that Mayflower's actions were unlawful. (*Id.* at 35.) Vinyard quoted the current price, including one hour of waiting time, at $2,641.19. (*Id.* at 37.) If the goods went into storage, however, Chen would need to raise nearly twice as much: $1,555 for delivery to storage; $249.60 for warehouse handling; and $667.04 for the first two months of storage, in all, storage costs totaling $2,481.64 not including the cost of delivery out of storage. (*Id.* at 37.) Vinyard then informed Chen that if she did not pay within 30 days, her property would be auctioned off. (*Id.* at 37-38.)

At 2:30 p.m., Chen called Vinyard one more time. (*Id.* at 39.) Vinyard informed Chen that she was on the other line with Mayflower headquarters, and that they had decided to put the

8

shipment in storage. (*Id.* at 39.) During this conversation, Vinyard explained that if Chen had had

the amount of the original estimate in cash, but not enough cash for the additional charges, she would

have had to pay the estimate plus 10%, and Mayflower would have billed her for the rest. (*Id.* at 43.)

Vinyard told Chen that she could come to the Lombard location and pay the storage costs by credit

card, but that she could not accept credit card payment for the actual shipment because she was not

the booking agent. (*Id.* at 44.) Vinyard told Chen that her total charges now stood at $5,122.83, not

including the cost of delivery out of storage, but that the owner of the company would give Chen "a

really big discount" and deliver the goods on July 6 if Chen could come up with a cashier's check

for $1,741.89 plus $2,240 for storage–a total of $3,981.89. (*Id.* at 51-52.)

The driver left with the shipment sometime after 2:30 p.m. (Chen Dep. at 314.) Chen's

goods remained in storage for three months, until Chen posted a $5000 bond for their retrieval

pursuant to a court order. (Pl.'s App., Ex. H at 2.)

Chen claims that since the events of June 30, 1999, she has suffered symptoms associated

with emotional distress: stomach aches, nausea, headaches, crying, loss of appetite, inability to

sleep, inability to concentrate, decreased enjoyment, low energy level, tension, increased irritability,

and excessive worrying and anxiety. (Chen Dep. At 350; Pl.'s App., Ex. G at 52; Ex. H at 2.) Chen

also failed the Illinois Bar Examination in July, 1999. (Pl.'s App., Ex. H at 5.)

## ANALYSIS

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any

material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ.

P. 56(c). In determining whether a genuine issue of material fact exists, the court must construe all facts and draw all reasonable and justifiable inferences in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## I.    Count III – Intentional Infliction of Emotional Distress

Chen alleges that Mayflower's conduct in providing her with a "guaranteed not to exceed" estimate and informing her by letter that payment could be made by major credit card, then later quoting charges more than twice the original estimate, wrongfully refusing to accept her credit card, putting her goods in storage, and threatening to auction the goods constituted intentional infliction of emotional distress.  In order to establish a claim for intentional infliction of emotional distress under Illinois law, a plaintiff must show that:  (1) the defendant's conduct was truly extreme and outrageous; (2) the defendant knew that there was a high probability that his or her conduct would cause severe emotional distress or intended to cause severe emotional distress; and (3) the conduct in fact caused severe emotional distress. *Honaker v. Smith*, 256 F.3d 477, 490 (7th Cir. 2001) (citing *McGrath v. Fahey*, 533 N.E.2d 806, 809 (1988)); *Lopacich v. Falk*, 5 F.3d 210, 212 (7th Cir. 1993).

Although Mayflower disputes a number of the facts Chen alleges, it argues that even if Chen's version of the facts is true, she has not shown the existence of intentional infliction of emotional distress.  In deciding a motion for summary judgment, the court does not decide between two competing versions of facts; rather, the issue is whether, if the facts are construed in the light most favorable to Chen, she has a remedy under Illinois law for intentional infliction of emotional distress. *See Lopacich*, 5 F.3d at 210-11.

## A.    The element of extreme and outrageous conduct.

With regard to the first element of intentional infliction of emotional distress, extreme and outrageous behavior, "[t]he liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or trivialities." *Public Finance Corp. v. Davis*, 360 N.E.2d 765, 767 (1976); *Lopacich*, 5 F.3d at 212; Restatement (Second) of Torts § 46 cmt. d (1965). Further, it is not sufficient "that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." *Public Finance*, 360 N.E.2d at 767 (quoting Restatement (Second) of Torts § 46, cmt. d (1965)) (internal quotations omitted).

The facts of each case must be judged by an objective standard to determine whether the defendant's conduct was extreme and outrageous. *Harriston v. Chicago Tribune Co.*, 992 F.2d 697, 703 (7th Cir. 1993); *Schroeder v. Lufthansa German Airlines*, 875 F.2d 613, 623 (7th Cir. 1989). Generally, when recitation of the facts of a case to average members of the community arouses their resentment against the actor and leads them to exclaim, "Outrageous!," extreme and outrageous behavior exists. Restatement (Second) of Torts § 46 cmt. d (1965).

The Seventh Circuit has directed courts evaluating whether conduct is extreme and outrageous to consider: (1) the power and influence wielded by the harassing party; (2) the likelihood that the threatened action could be carried out; (3) the legitimate reasons one might have for making the offensive statement; and (4) the defendant's awareness of the plaintiff's susceptibility to emotional stress. *Lopacich*, 5 F.3d at 212 (citing Illinois cases). Those factors are to be

considered in light of all of the facts and circumstances in a particular case, and the presence or absence of any of these factors is not necessarily critical to a cause of action for intentional infliction of emotional distress. *See McGrath*, 533 N.E.2d at 811 ("The outrageousness of a defendant's conduct must be determined in view of all the facts and circumstances pleaded and proved in a particular case.")

### 1.    The power and influence of the defendant.

Chen emphasizes the power that Mayflower wielded by virtue of its possession and control over virtually all of her worldly possessions. A reasonable jury could conclude that Mayflower's control over Chen's belongings placed it in a position of actual or apparent power to affect Chen's interests. *See* Restatement (Second) of Torts § 46, cmt. e (1965). Indeed, because Chen could not pay the money that Mayflower demanded for delivery, Chen's property was put into storage. Mayflower's position of power, standing alone, does not relieve Chen of the burden to show that Mayflower's conduct was truly extreme and outrageous and not mere insults or indignities. *Plocar v. Dunkin' Donuts of America, Inc.*, 431 N.E.2d 1175, 1180 (Ill. App. 1981); *Schroeder*, 875 F.2d at 624. However, the higher the degree of power held by the harassing party, the more likely it is that the conduct will be deemed outrageous, particularly when the alleged conduct involves either a veiled or explicit threat to exercise the power to the plaintiff's detriment. *McGrath*, 533 N.E.2d at 809.

Here, a reasonable jury could conclude that Mayflower held a high degree of power over Chen. By June 30, 1999, Chen had already waited nine additional days for her goods to arrive, incurring reimbursable expenses close to the amount of the original estimate for the move. (Def.'s

Stmt., Ex. H at 27-29.) When the truck finally arrived, Chen was told not only that she needed to have cash in order for delivery to take place but that the actual cost of the move exceeded the original binding estimate by over $800. As the day wore on, the cost continued to increase as overtime charges began to apply. (Def.'s Stmt., Ex. H at 33-34.) Furthermore, Mayflower repeatedly informed Chen that her failure to raise the cash would result in the goods being put in storage and possibly auctioned within 30 days to cover the cost of the move. (*Id.* at 37, 39, 48.) The goods were, in fact, put into storage, and the final cost to Chen of retrieving them was quoted at $3981.89– $2,240 over the cost of the original binding estimate. (Def.'s Stmt., Ex. H at 51-52.)

Although Mayflower's representatives, Vinyard and Swenson, were not hostile or rude when they relayed the threat of storage and auction, their behavior need not consist of vituperative attacks to rise to the level of extreme and outrageous conduct when there is a power differential inherent in the situation.[7] As noted by the Illinois Supreme Court in *McGrath*, "[t]he extreme and outrageous nature of the conduct may arise not so much from what is done as from abuse by the defendant of some relation or position which gives him actual or apparent power to damage the plaintiff's interests. The result is something very like extortion." 533 N.E.2d at 810 (quoting *Milton v. Illinois Bell Telephone Co.*, 427 N.E.2d 829, 832 (Ill. App. 1981)(internal quotations omitted)). Chen contends that Mayflower improperly used the leverage it enjoyed by virtue of its control over her property to extort additional money and to ensure that it would make money regardless of its

---

[7] Mayflower takes issue with the characterization of Vinyard and Swenson's statements as "threats." (Def's. Reply at 4-5.) Drawing all reasonable inferences from the record in Chen's favor, however, Vinyard's statement, "If you come here and you pay that amount, [$2,481.64] that will secure that your shipment will stay here and not be auctioned after 30 days," could reasonably be construed as a threat. (Def.'s Stmt., Ex. H at 48.)

obligation to reimburse Chen for her delay expenses. Construing the facts in the light most favorable to Chen, a reasonable jury could find that Mayflower abused its power in this situation.

### 2. Likelihood that the threats would be executed.

The next consideration is the apparent likelihood that Mayflower would have carried through its threats to place Chen's goods in storage and auction them if she was unable to pay the monies demanded. *See McGrath*, 533 N.E.2d at 810 ("[W]hen threats of improper use of power or authority form the crux of an action for emotional distress, it should appear that the plaintiff reasonably believed that those threats would be carried out.") *Accord Plocar*, 431 N.E.2d at 1180; *Lopacich*, 5 F.3d at 212. With regard to the threat to put the goods in storage, the analysis is simple because Mayflower in fact carried out that threat. Chen's property was put in storage the afternoon of June 30, where it remained until October 5, 1999, when it was released pursuant to a court order. (Pl.'s App., Ex. H at 2.) A jury could determine that Chen reasonably believed that Mayflower would auction her possessions if she did not pay for the cost of storage. Moreover, Mayflower was clearly in a position to execute its threats given that it maintained complete control over Chen's goods.

### 3. Whether Mayflower reasonably believed its conduct furthered a legitimate objective.

In determining whether Mayflower's position of power elevates its conduct to the level of extreme and outrageous behavior, the court must also consider whether Mayflower reasonably believed its conduct furthered legitimate aims. *See McGrath*, 533 N.E.2d at 810 ("When a defendant in an action for emotional distress is accused of improperly using a position of power or authority, courts view this allegation in conjunction with another significant consideration: whether the defendant reasonably believed that his objective was legitimate."). *Accord Honaker*, 256 F.3d at

491; *Lopacich*, 5 F.3d at 212. Courts accord greater latitude to a defendant pursuing a reasonable objective even if that pursuit results in distress for the plaintiff. *Public Finance,*, 360 N.E.2d at 768; *Honaker*, 256 F.3d at 491.

Mayflower contends that it had a legitimate right to demand cash in payment for its services, and to put Chen's possessions in storage until she ponied up. Mayflower characterizes the situation as a simple consumer transaction in which Chen unreasonably believed she could pay with a credit card, and suffered inconvenience when she discovered that she could not. Mayflower analogizes the situation to that in *Public Finance*, where the Illinois Supreme Court held that, even given the creditor's position of power, its conduct in collecting a debt—which it had a right to do—was not extreme and outrageous. *Public Finance*, 360 N.E.2d at 768-69. Mayflower argues that its behavior, as evidenced in particular by the calm and civil conversations between Chen, Vinyard and Swenson, was not nearly as extreme as that in *Public Finance*. In *Public Finance*, the creditor called the debtor several times per week; came to the debtor's home one or more times per week; called the debtor at the hospital even after she told a representative of her daughter's serious condition and her own nervous condition; induced the debtor to write a bad check under the promise that the check would not be processed; and then informed an acquaintance of the debtor that she was passing bad checks. *Public Finance*, 360 N.E.2d at 768.

Mayflower cites statutes to support its position that it was entitled to be paid for its moving services, *see* 49 U.S.C. § 13707(a) (stating that "a carrier providing transportation or service subject to jurisdiction under this part shall give up possession at the destination of the property transported by it only when payment for the transportation or service is made"), and that a lien may be brought

15

against goods in storage and executed by public or private sale of the goods, *see* 810 Ill. Comp. Stat. 5/7-209 and 5/7-210.

Unlike the *Public Finance* case, where there was no dispute as to the legitimacy of the creditor's right to collect the debt, (360 N.E.2d at 768), here the crux of Chen's claim is that Mayflower had no legitimate basis for its conduct, but rather breached its contract with Chen by refusing to accept her credit card and tacking on unauthorized and unnecessary additional charges. (Second Am. Compl. ¶¶ 115-128.) *See McGrath*, 533 N.E.2d at 812 (plaintiff stated claim for intentional infliction of emotional distress in case where bank officials refused to surrender funds in plaintiff's certificates of deposit due to a realty contract dispute and harassed plaintiff with phone calls while he recuperated from a massive heart attack, where plaintiff alleged that defendants had no legal basis for their actions). The parties here dispute which documents constitute their contract and which contract terms govern method of payment and the legitimacy of additional charges. All of these issues bear directly on the reasonableness of both parties' actions. Moreover, Chen has alleged that Mayflower's conduct constituted part of a pattern of racketeering activity that involved mail fraud, wire fraud, theft from an interstate shipment, and extortion. (Second Am. Compl. ¶¶ 154-66.)

Thus, issues of material fact exist with regard to the reasonableness of Mayflower's belief in legitimacy of its conduct. Where there is a mixed question of law and fact, as here, the jury should resolve the factual issues with the proper instructions from the court. *McGrath*, 533 N.E.2d at 811. Furthermore, even if it were determined that Mayflower reasonably believed its objective was legitimate, that fact alone does not preclude a claim for intentional infliction of emotional distress.

Rather, it is only one factor, albeit a substantial one, in evaluating the defendant's conduct. *Id.* at 810.

### 4. Mayflower's knowledge of Chen's susceptibility to emotional distress.

The final factor to consider is whether the defendant was aware of the plaintiff's peculiar susceptibility to emotional distress. *See McGrath*, 533 N.E.2d at 811; *Lopacich*, 5 F.3d at 212. Mayflower argues in its reply that it had no knowledge of any particular susceptibility on Chen's part to emotional distress and, therefore, cannot be liable for intentional infliction of emotional distress. Specifically, Mayflower contends that (1) it could not have predicted that the events of June 30 could have led to Chen's seeking psychological help; and (2) although it knew that Chen's bar review materials were in the shipment, it could not have known the significance of those materials or that the bar examination was imminent. (Def.'s Reply at 8.) Again, no one factor is critical to a finding that a reasonable jury could determine that Mayflower's behavior was extreme and outrageous. *See McGrath*, 533 N.E.2d at 811. However, a question of fact exists at least as to whether Mayflower had knowledge that depriving Chen of her bar review materials, particularly in light of the delay in delivery that had already occurred, could cause significant emotional distress to which she was particularly susceptible.

Thus, considering the facts in the light most favorable to Chen, a reasonable jury could conclude that Mayflower's conduct was extreme and outrageous.

### B. Mayflower's intent to cause severe emotional distress or knowledge that actions were likely to cause severe emotional distress.

The second element of a claim of intentional infliction of emotional distress requires the plaintiff to show that the defendant either intended to cause severe emotional distress or knew there

was a high probability that its conduct could result in severe emotional distress. *Lopacich*, 5 F.3d at 212. Where a defendant's actions, by their very nature, are likely to cause severe distress or where the defendant knew a plaintiff was particularly susceptible to emotional distress, this element of the claim is generally satisfied. *Honaker*, 256 F.3d at 494. In this case, a jury could reasonably conclude that Mayflower's actions in delaying the delivery of Chen's goods, refusing to accept her credit card, inflating the price of the move, threatening to put her goods in a storage facility if she did not come up with the full amount in cash, threatening to auction her possessions if she did not pay the demanded price for storage and redelivery in addition to the original estimate, and holding her possessions—including her bar review materials—for three months, could have the potential of causing Chen severe emotional distress. Thus, for the purpose of surviving summary judgment, Chen meets the second element of her claim of intentional infliction of emotional distress.

### C.      The severity of Chen's emotional distress.

The Illinois Supreme Court has stated that "[t]he law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it. The intensity and duration of the distress are factors to be considered in determining its severity." *McGrath*, 533 N.E.2d at 809, quoting Restatement (Second) of Torts § 46, cmt. j at 77-78 (1965). When a plaintiff experiences physical symptoms or illness as a result of the distress, rather than mere embarrassment or humiliation, it is more likely that the plaintiff has a remedy under Illinois law for intentional infliction of emotional distress. *See Honaker*, 256 F.3d at 495. In this case, Chen has produced evidence to show that she was severely distressed and panicked on the day of the move, and that the distress continued to affect her life. Chen testified that she experienced physical symptoms including

stomach aches, nausea, and headaches. (Chen Dep. at 350.) She submitted a report by Henry Conroe, M.D., who performed a psychiatric evaluation of Chen. (Pl.'s App., Ex. H at 1.) Dr. Conroe reported that Chen has suffered emotional symptoms including crying, loss of appetite, inability to sleep, inability to concentrate, decreased enjoyment, low energy level, tension, increased irritability, and excessive worrying and anxiety. (*Id.* at 2.) Dr Conroe's report concluded that the emotional distress stemming from Chen's experience with Mayflower contributed to her failing the Illinois State Bar Examination on her first try. (*Id.* at 5.) This evidence is sufficient to withstand summary judgment on this element of the intentional infliction of emotional distress claim. The question of whether Chen's distress is severe enough will be for a jury to decide.

Thus, Mayflower's motion for summary judgment on Count III for intentional infliction of emotional distress is denied.

## II. Count IV – Negligent Infliction of Emotional Distress

Chen also claims that Mayflower is liable for her emotional distress under theory of a negligent infliction of emotional distress. To state a claim for this cause of action, Chen must first allege the traditional negligence elements: duty, breach, causation, and damages. *Fenner v. Favorite Brands Int'l, Inc.*, No. 97 C 5906, 1998 WL 249232, at *7 (N.D. Ill. May 12, 1998)(Gettleman, J.) (citing *Corgan v. Meuhling*, 574 N.E.2d 602, 606 (1991)). Mayflower argues that to recover damages for negligent infliction of emotional distress under Illinois law, however, Chen must also demonstrate that she experienced a contemporaneous physical injury or impact, the so-called "impact rule." Chen contends that recent decisions of the Illinois courts have disavowed the impact rule by

eliminating the need for a "direct victim" to show some type of physical impact in order to recover for negligent infliction of emotional distress.

As the dispute between the parties indicates, there is some uncertainty regarding what Illinois law requires of a direct victim to recover on a claim of negligent infliction of emotional distress. Prior to the Illinois Supreme Court's decision in *Rickey v. Chicago Transit Auth.*, 457 N.E.2d 1 (Ill. 1983), both direct victims of negligence and bystanders were required to allege a contemporaneous physical injury or impact in order to state a claim for negligent infliction of emotional distress. *See Kapoulas v. Williams Ins. Agency, Inc.*, 11 F.3d 1380, 1381-82 (7th Cir. 1993). *Rickey* enlarged the class of plaintiffs who could recover as bystanders, holding instead that bystanders needed to allege that they were in the zone of physical danger created by defendant's negligence, and that they suffered a physical injury or illness as a result of the distress caused by the negligence. *Rickey*, 457 N.E.2d at 5. In *Corgan v. Meuhling*, 574 N.E.2d 602 (Ill. 1991), the Illinois Supreme Court considered a claim for negligent infliction of emotional distress by a patient who alleged that her psychologist caused her emotional distress by engaging in sexual relations with her under the guise of therapy. The *Corgan* court clarified that its holding in *Rickey* did not extend to *direct* victims of negligence seeking to recover for their emotional distress, and held that direct victims need not allege either that they were in the zone of physical danger or that they suffered physical injury or illness resulting from their distress. *Corgan*, 574 N.E.2d at 604-05, 607-09. *Corgan* did not address explicitly whether the "impact rule" was still in force for direct victims, although the plaintiff in *Corgan* arguably alleged some physical impact in that her claim arose out of sexual relations. *See Choi v. Chase Manhattan Mortgage Co.*, 63 F. Supp. 2d 874, 887 (N.D. Ill. 1999) (Moran, J.) (noting that the *Corgan* court "seemed to skip a step" in failing to discuss whether plaintiff needed

to allege a physical impact). Subsequently, the Seventh Circuit, interpreting *Corgan*, stated that the impact rule still applies to direct victims under Illinois law. *Kapoulas*, 11 F.3d at 1382.

Chen argues that the *Kapoulas* court was merely predicting the Illinois Supreme Court's ruling on the impact rule, and that it was incorrect. In support, Chen cites *Pasquale v. Speed Products Engineering*, 654 N.E.2d 1365 (Ill. 1995). In *Pasquale*, the Illinois Supreme Court held that the elimination of a contemporaneous physical impact or injury requirement for bystander plaintiffs in the realm of negligent infliction of emotional distress claims did not translate into an elimination of the element of physical harm for a bystander's recovery of emotional distress damages in the realm of strict liability claims. *Id.* at 1373. The *Pasquale* court also noted in *dicta* that *Corgan* "eliminated the contemporaneous injury or impact requirement for a direct victim's recovery for emotional distress on a theory of negligence." *Id.* at 1371. Thus, Chen argues, she need not show any physical impact to recover damages for negligent infliction of emotional distress.

At least one judge in this District has expressed disagreement with *Pasquale's* interpretation of *Corgan*. In *Fenner*, Judge Gettleman characterized the *Pasquale* court's characterization of the holding in *Corgan* as inaccurate, instead applying the *Kapoulas* court's interpretation. *Fenner*, 1998 WL 249232, at *7. Judge Gettleman interpreted *Corgan* as deciding that a direct victim of negligence need not allege a "physical injury or illness as a result of the emotional distress," not that the victim need not allege a physical impact or injury in the first place. *Id.* Thus, *Corgan* did not actually eliminate the impact rule for direct victims claiming negligent infliction of emotional distress. *Id.*(citing *Kapoulas*, 11 F.3d at 1382).

This Court agrees with the interpretation of *Corgan* as expressed by the Seventh Circuit in *Kapoulas*, by Judge Gettleman in *Fenner*, and by Judge Moran in *Choi*. Direct victims must

experience "some form of physical danger or harm as the catalyst for the resulting emotional trauma." *Choi*, 63 F. Supp. at 888 (rejecting plaintiff's characterization of "recent court decisions" as eliminating the impact rule, and holding that a negligent infliction of emotional distress claimant must allege a physical impact). *Accord Kapoulas*, 11 F.3d at 1382; *Fenner*, 1998 WL 249232, at *8. Otherwise, "the scope of recovery for negligent infliction of emotional distress would be conterminous with recovery for negligence itself. The Illinois Supreme Court clearly did not intend that situation." *Fenner*, 1998 WL 249232, at *8 (citing *Brogan v. Mitchell Int'l, Inc.*, 692 N.E.2d 276, 278 (Ill. 1998); *Doe v. Roe*, 681 N.E.2d 640, 648 (Ill. App. 1997)).[8]

Thus, to defeat a motion for summary judgment on her negligent infliction of emotional distress claim, Chen is required to produce some evidence that Mayflower's alleged negligence involved a physical impact or injury that caused her emotional distress. Chen has not done so. Mayflower's retention of Chen's belongings does not qualify as an "impact" under Illinois law. *See Choi*, 63 F. Supp. 2d at 888 (noting that most negligent infliction of emotional distress cases involve accidents or offensive touching and holding that a couple who was forced to move as a result of their mortgage company's negligence did not suffer a physical impact or injury as defined by Illinois law).

---

[8] Judge Gettleman observed in *Fenner*:

> A case may present itself where a defendant's special relationship with the plaintiff, or other unique circumstances, will justify imposing on the defendant a duty to refrain from negligently inflicting emotional harm on the plaintiff, even in the absence of a physical impact or injury, or the danger thereof. This case, however, is not that case.

1998 WL 249232, at *9. Likewise, Chen's claim is also not that case.

Therefore, Mayflower's motion for summary judgment with regard to Count IV, Chen's claim of negligent infliction of emotional distress, is granted.[9]

## III.    Count II – Conversion

Finally, Mayflower argues that the Carmack Amendment to the Interstate Commerce Act preempts Chen's state law claim of conversion.[10]  The Carmack Amendment governs the liability of a common carrier to a shipper for loss of, or damage to, an interstate shipment. *See Gordon v. United Van Lines, Inc.*, 130 F.3d 282, 285-86 (7th Cir. 1997); *North Am. Van Lines, Inc. v. Pinkerton Sec. Sys., Inc.*, 89 F.3d 452, 455 (7th Cir. 1996); 49 U.S.C. 14706(a)(1) ("The liability imposed under this paragraph is for the actual loss or injury to the property . . .").

Because the purpose of the Carmack Amendment is to "establish uniform federal guidelines designed in part to remove the uncertainty surrounding a carrier's liability when damage occurs to a shipper's interstate shipment," it has broad preemptive scope over state and common law claims arising out of interstate shipments. *Hughes v. United Van Lines, Inc.*, 829 F.2d 1407, 1415 (7th Cir. 1987).  Indeed, "[a]lmost every detail of the subject is covered so completely that there can be no rational doubt that Congress intended to take possession of the subject and supersede all state regulation with reference to it." *Adams Express Co. v. Croninger*, 226 U.S. 491, 505-06 (1913). *See*

---

[9]  Mayflower's motion also argued that Chen's claim for negligent infliction of emotional distress is preempted by the Carmack Amendment to the Interstate Commerce Act.  Because the lack of a physical impact disposes of Chen's negligent infliction of emotional distress claim, it is unnecessary to determine whether that claim would be preempted by the Carmack Amendment.

[10]  Mayflower's only argument in its present motion against Chen's conversion claim is Carmack Amendment preemption.  Because Mayflower has not raised any issues as to the viability of the conversion claim itself, it is not necessary to evaluate whether Chen could, in fact, recover any damages for the alleged conversion of her property.

*also New York, Philadelphia, & Norfolk R.R. Co. v. Peninsula Produce Exchange of Maryland*, 240 U.S. 34, 38 (1916) ("The words 'any loss, damage, or injury to such property,' . . . are comprehensive enough to embrace all damages resulting from any failure to discharge a carrier's duty with respect to any part of the transportation to the agreed destination"); *Hughes*, 829 F.2d at 1415 (holding that the remedy provision of the Carmack Amendment preempts all inconsistent state and common law remedies).

However, "the Carmack Amendment does not preempt those state law claims that allege liability on a ground that is separate and distinct from the loss of, or the damage to, the goods that were shipped in interstate commerce." *Gordon v. United Van Lines, Inc.*, 130 F.3d 282, 289 (7th Cir. 1997). *Accord Rini v. United Van Lines, Inc.*, 104 F.3d 502, 506 (1st Cir. 1997) (stating that the Carmack Amendment does not preempt liability arising from separate harms apart from the loss or damage of goods, including intentional infliction of emotional distress claims); *Hubbard v. All States Relocation Serv., Inc.*, 114 F. Supp. 2d 1374, 1377 (S.D. Georgia, 2000) (stating that "claims that are not for damages to goods, such as claims for damage to the person, are not preempted").

In *Gordon*, the Seventh Circuit considered the case of Ruth Slavin, an ailing 80-year-old widow who entrusted her most prized and valuable personal possessions to a shipping company when she moved from Florida to Chicago to be closer to her daughter. 130 F.3d at 284. The driver, who promised to deliver the most valuable goods to Slavin's daughter, in fact gave a messenger $40 to deliver them. *Id*. at 285. The messenger, however, pocketed the $40 and disposed of the goods, which were destroyed. *Id*. Adding insult to injury, United Van Lines repeatedly lied to Slavin and her daughter regarding the safety and location of the goods during the claims process. *Id*. The court held that Slavin's state law claims for breach of contract, willful and wanton misconduct, and Illinois

Consumer Fraud and Deceptive Business Practices were preempted as they related to the loss or damage of the goods. *Id.* at 289. The court also found that Slavin's common law fraud claim, which alleged fraud both in the inducement and in the claims process, was preempted because (a) the making of the contract was so closely related to the carriage and damages were likely to be the loss or damage to the goods; and (b) the claims process is directly related to the loss or damage to the goods that were shipped. *Id.* at 289-90. The court held, however, that the Carmack Amendment did not preempt Slavin's intentional infliction of emotional distress claim, because that claim alleged a harm separate and distinct from the loss of the goods. *Id.* at 289.

Chen argues that her conversion claim is separate and distinct from any claim relating to the loss of, or damage to, her property. Under Illinois law, conversion is any unauthorized act that deprives a person of his or her property either (1) permanently; or (2) for an indefinite period of time. *Colonial Funding, L.L.C. v. Am. Empire Surplus Lines Ins. Co.*, 719 N.E.2d 1098, 1100 (Ill. App. 1999). Chen is apparently seeking damages for conversion arising out of the "deprivation for more than three months of virtually all of her material belongings . . . [and] great inconvenience" caused by Mayflower's actions. (Second Am. Compl. ¶ 57.) Chen argues that she is not alleging any actual loss or damage to her property; indeed, she eventually recovered her property and has filed no claims for missing or damaged items. (Pl.'s Resp. at 13-14.) As such, Chen contends that her conversion claim which, oddly, is pled under the Carmack Amendment (Second Am. Compl. ¶ 3), is necessarily separate and distinct from a claim arising out of loss of or damage to her property and thus should fall outside the scope of Carmack preemption.

The issue is whether Chen's claim of temporary deprivation of her goods and not the actual damage to or permanent loss of the goods is preempted. It is. "Courts have interpreted the scope

of carrier liability covered by the Carmack Amendment to extend beyond claims for damages to the property being delivered." *V.R. Compounding Corp. v. Occidental Chem. Corp.*, No. 99 C 8087, 2000 WL 1368045, at *3 (N.D. Ill. Sept. 15, 2000)(Guzman, J.)(citing *Air Prods. & Chems., Inc. v. Illinois Central R.R. Co.*, 721 F.3d 483, 485-86 (5th Cir. 1983)). Indeed, in *New York, Philadelphia, & Norfolk Railroad Co. v. Peninsula Produce Exchange of Maryland*, 240 U.S. 34, 38 (1916), the Supreme Court held that the Carmack Amendment is broad enough to impose liability for damages arising out of a delay in shipment of goods, even though the shipment eventually reached its destination. The Supreme Court stated that "the words 'any loss, damage, or injury to such property' . . . are comprehensive enough to embrace all damages resulting from any failure to discharge a carrier's duty with respect to any part of the transportation to the agreed destination." *Id. See also Southeastern Express Co. v. Pastime Amusement Co.*, 299 U.S. 28 (1936) (Carmack Amendment applied to plaintiff's claim for business interruption caused by the late delivery of a motion picture).

Courts addressing fact patterns involving the delay or misdelivery of household goods have determined that the Carmack Amendment preempted the plaintiffs' state law tort claims even in the absence of actual damage to or permanent loss of the goods. *See Moffit v. Bekins Van Lines Co.*, 6 F.3d 305, 306 (5th Cir. 1993) (Carmack Amendment preempted state law claims arising out of carrier's failure to deliver household goods to shippers' new address in time for Christmas); *Richter v. North Amer. Van Lines, Inc.*, 110 F. Supp. 2d 406, 412-13, n.3 (D. Md. 2000) (noting that there is a temporary loss of goods when delivery is delayed and holding that Carmack Amendment preempted plaintiffs' state law claims arising out of the seven-day delay of delivery of their household goods); *Duerrmeyer v. Alamo Moving and Storage One, Corp.*, 49 F. Supp. 2d 934, 936 (W.D. Texas 1999) (holding that plaintiff's state law conversion claim arising out of carrier's

26

placement of household items in storage due to dispute over transportation costs flowed from the shipping contract and was therefore preempted by Carmack Amendment); *Arnell v. Mayflower Transit, Inc.*, 968 F. Supp. 521, 523-24 (D. Nevada 1997) (Carmack Amendment preempted plaintiffs' state law claims arising in part out of carrier's delivery of household goods into a storage facility).

Here, Mayflower's placement of Chen's goods in storage and the resulting temporary deprivation flowed from a dispute between the parties regarding the proper amount and method of payment as defined by the contract. The damages that Chen seeks in her conversion claim arise out of the loss of her goods, however temporary, and not out of a personal harm such as is alleged in her claim for intentional infliction of emotional distress. Thus, Chen's conversion claim is closely related to the performance of the contract and does not qualify as a separate and distinct harm that would fall outside the preemptive scope of the Carmack Amendment. *See, e.g., Gordon*, 130 F.3d at 289 (holding that Carmack Amendment preempted common law fraud in the inducement claim because it was so closely related to the performance of the contract for carriage); *V.R. Compounding*, 2000 WL 1368045 at *4 ("[O]f paramount importance in determining whether the Carmack Amendment applies is whether the damage resulted from the breach of a duty under a transportation contract."); *Duerrmeyer*, 49 F. Supp. 3d at 936-37 (Carmack Amendment preempted state law tort causes of action because they sought damages flowing from the shipping contract even though the goods weren't actually lost or damaged). Accordingly, Mayflower's motion for summary judgment on Count II, Chen's claim of conversion, is granted.

## CONCLUSION

For the reasons stated above, Mayflower's motion for summary judgment on Counts II and IV of the Second Amended Complaint is GRANTED and Mayflower's motion for summary judgment on Count III is DENIED.

**IT IS SO ORDERED.**

**GERALDINE SOAT BROWN**
**United States Magistrate Judge**

**DATED:   July 19, 2002**