# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Geraldine Soat Brown | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 6261 | **DATE** | 3/11/2004 |
| **CASE TITLE** | Chen vs. Mayflower Transit | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Status set for 3/29/04 at 9:45 a.m., at which time the trial date will be set. For the reasons set out in the Memorandum Opinion and Order, Defendant's Motion for Summary Judgment on the RICO Claims (Count V of the Second Amended Complaint) [102-1] is DENIED; Defendant's Motion to Strike Exhibit 50 to the Plaintiff's Statement of Material Facts [113-1] is GRANTED; and Plaintiff's Second Motion to Strike Portions of Mayflower's LR 56.1 statement and affidavits [108-1] is DENIED AS MOOT.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | **number of notices** | **Document Number** |
| | No notices required. | | | |
| ✓ | Notices mailed by judge's staff. | | MAR 1 2 2004 | |
| | Notified counsel by telephone. | | **date docketed** | 119 |
| | Docketing to mail notices. | | 15 | |
| | Mail AO 450 form. | | **docketing deputy initials** | |
| | Copy to judge/magistrate judge. | | 3/11/2004 | |
| | | | **date mailed notice** | |
| GR | courtroom deputy's initials | | GR | |
| | | | **mailing deputy initials** | |

CLERK U.S. DISTRICT COURT

2004 MAR 11 PM 2:41

Date/time received in central Clerk's Office

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| ANGIE CHEN, | ) | |
| Plaintiff, | ) | Cause No. 99 C 6261 |
| | ) | |
| v. | ) | Magistrate Judge Geraldine Soat Brown |
| | ) | |
| MAYFLOWER TRANSIT, INC., | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Angie Chen ("Chen") filed a Second Amended Complaint against Defendant

Mayflower Transit, Inc. ("Mayflower") alleging breach of contract, conversion, intentional infliction

of emotional distress, negligent infliction of emotional distress, and violation of the Racketeer

Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962 *et seq*. [Dkt 48.] This court

previously granted summary judgment in favor of Mayflower on the conversion and negligent

infliction of emotional distress counts, and denied summary judgment on the intentional infliction

of emotional distress count. [Dkt 72, 87.] *See Chen v. Mayflower Transit, Inc.*, No. 99 C 6261,

2002 WL 1632412 (N.D. Ill. July 22, 2002) (Brown, M.J.).

Before the court now is Mayflower's motion for summary judgment on the RICO count

(Count V). [Dkt 102.] Also before the court is Mayflower's motion to strike Exhibit 50 to plaintiff's

L.R. 56.1 statement [dkt 113], and Chen's second motion to strike portions of Mayflower's L.R. 56.1

statement and affidavits [dkt 108]. The parties have consented to the jurisdiction of the United

States Magistrate Judge pursuant to 28 U.S.C. § 636(c). [Dkt 11.] For the reasons set forth below,

Mayflower's motion for summary judgment is denied, Mayflower's motion to strike is granted, and

Chen's second motion to strike is denied as moot.

# FACTUAL BACKGROUND[1]

## I.   <u>Chen's Move with Mayflower</u>

In 1999, Chen decided to move her furniture and household goods from Atlanta, Georgia to Chicago, Illinois. (Def.'s LR Resp. ¶¶ 42, 45.) In late May 1999, Chen contacted AAA Admiral Moving and Storage ("Admiral"), a local moving company affiliated with Mayflower and located in Atlanta. (*Id.* ¶ 42.) *See also Chen*, 2002 WL 1632412 at *1; Pl.'s Resp. Def.'s LR Stmt. ¶ 4 [dkt 78].[2]

### A.   The Estimate for Chen's Move

On June 4, 1999, an estimator came to Chen's apartment to inspect her property and

---

[1] The following facts are taken from the parties' responses to the respective statements filed pursuant to Local Rule 56.1, which are cited herein as: "Pl.'s LR Resp. ¶ ___" [dkt 105], "Def.'s LR Resp. ¶ ___" [dkt 114], and from the exhibits submitted with those statements or the responses to those statements ("Pl.'s LR App. Ex.___, ___ at ___" [dkt 106, 107], "Def.'s LR App. Ex. ___, ___ at___" [dkt 103], "Def.'s Supp. Ex. ___, ___ at ___" [dkt 114] and "Def.'s LR Resp. Aff. Ex. ___, ___ at ___" [dkt 111].) The facts recited are only those relevant to the RICO count that is the subject of the present motion for summary judgment. For additional discussion of the factual background of this case, *see Chen v. Mayflower Transit, Inc.*, 159 F. Supp. 2d 1103 (N.D. Ill. 2001) and *Chen*, 2002 WL 1632412.

[2] Mayflower asserts that Chen's attempt to characterize Admiral and the other local moving companies associated with Mayflower as anything but "agents" is "misleading and unsupported by the evidence." (Def.'s LR Resp. ¶¶ 3, 42.) The court disagrees. "Agent" is a legal conclusion meaning "one who is authorized to act for or in place of another; a representative." *Black's Law Dictionary* 64 (Bryan A. Garner ed., 7th ed., West 1999). The local moving companies are not agents in all circumstances. *See* Def.'s LR Resp. ¶ 3 (stating that the local moving companies have separate management from Mayflower and that Mayflower does not control their non-Mayflower business). This opinion will refer to the local moving companies as affiliates, agents, or local moving companies.

determine the cost of her move. *See Chen*, 2002 WL 1632412 at *1; Pl.'s Resp. Def.'s LR Stmt. ¶ 5 [dkt 78]. On that same day, Admiral provided Chen with an estimate for the price of her move, which was handwritten on a pre-printed "Estimate/Order for Service" form (the "Handwritten Estimate"). (Pl.'s LR App. Ex. 6, Handwritten Estimate at 1-2.) The Handwritten Estimate contained the handwritten phrase "[g]uaranteed not to exceed $1,741.89." (*Id.* at 1.) According to the Handwritten Estimate, that amount included "total containers packing and unpacking," "total line haul charges" and certain "other charges," including charges for the fact that there were stairs at the origin and an elevator at the destination. (*Id.*) Chen testified that prior to her receipt of the Handwritten Estimate, she was asked whether there was an elevator at her destination and whether a moving truck could park near the entrance of her new apartment, but was not asked about any other conditions at the destination. (Pl.'s LR App. Ex. 5, Chen Dep. at 195-196.) Mayflower admits that Chen was orally informed by the Admiral representative that the price of her move "would not go above $1,741.89," and that it could be less. (Def.'s LR Resp. ¶ 43.) Chen testified that she was also told that if she signed the Handwritten Estimate, "Mayflower would get all of [her] stuff from [her] apartment in Atlanta into [her] apartment in Chicago for a price that would not go above $1,741.89." (Chen Dep. at 197-198.)

The Handwritten Estimate stated: "If this shipment is a binding estimate, then this amount covers only the services and quantities shown in the estimate. If items are added to the shipment or additional services are performed, additional cost may result." (Handwritten Estimate at 1.) The Handwritten Estimate also provided: "A Binding Estimate represents the charges for only those services indicated on the Estimated Charges sheet. It does not include charges for services to be performed at destination, unless specifically set forth. Charges for all additional services will be

3

added to your final bill." (*Id.* at 2.) According to one of Mayflower's representatives, Mayflower's binding estimates typically do not include services required at the destination. (Pl.'s LR App. Ex. 1, Webb Dep. at 84.) That representative also testified that Mayflower does not require its booking agents to inquire into conditions that might lead to additional charges. (*Id.* at 77-78.)

The Handwritten Estimate was signed by the "Carrier's Representative."[3] (Handwritten Estimate at 1.) Chen signed some of the signature blocks on the Handwritten Estimate, including one which stated that she "should sign below only if [she] wish[es] this carrier to perform all the services required." (*Id.*) Chen included the date June 4, 1999 next to her signature on the Handwritten Estimate.[4] She did not sign the signature block stating that she had received the pamphlet "Your Rights and Responsibilities When You Move." (*Id.*)

The method of payment was not discussed on June 4. *Chen*, 2002 WL 1632412 at *1 (citing Chen Dep. at 183-84, 187-92.) However, a section of the Handwritten Estimate reads: "Unless credit approval is completed in advance of shipment, all monies must be paid in U.S. funds by cash, cashier's check, certified check or money order at or before the time of delivery." (Handwritten Estimate at 1.) Chen subsequently received a form letter from Admiral confirming June 10 to June 14 for the loading of her goods and June 15 to June 21 for delivery. (Pl.'s LR App. Ex. 7, Admiral Letter to Chen.) That letter also stated: "Payment is due at the time of delivery and can be made in cash, certified check or money order, or a Major Credit Card, or direct billing to company with

---

[3] "Carrier" refers to the company moving the goods.

[4] That date is not legible on the copies submitted to the court in connection with the instant motion (Handwritten Estimate at 1), but it is legible on previous copies submitted to the court in connection with other motions. *See, e.g.*, Def.'s LR Stmt. Supp. Def.'s Mot. Summ. J. Pendent Cts. 2nd Am. Compl., Ex. B. [Dkt. 74.]

approved letter of authorization and approved credit check. If you choose to change your payment plan, we ask that you notify our office within 5 working days of your actual move date." (*Id.*) (emphasis omitted). The letter did not mention any requirement that Chen seek pre-approval for her credit card. (*Id.*) Chen testified that she believed that the letter granted her the approval to pay for her move by credit card. (Chen Dep. at 206.)

In addition, Chen subsequently signed all of the signature blocks on another estimate. That estimate was typewritten on a pre-printed "Estimate/Order for Service" form that was identical to the Handwritten Estimate form (the "Typed Estimate"). (Def.'s LR App. Ex. A(5), Typed Estimate at 1-2.) Chen included the date of June 15, 1999 next to two of her signatures on the Typed Estimate.[5] The Typed Estimate omitted the phrase "guaranteed not to exceed," but stated that the total "bound services" amounted to $1,385.19 and the "total estimate" amounted to $1,741.89. (*Id.* at 1.) The Typed Estimate stated that it was a "binding estimate" as of June 7, 1999. (*Id.*)

**B. The Loading of Chen's Goods in Atlanta**

Chen's move took place on June 10, 1999. (Def.'s LR Resp. ¶ 45.) After Admiral loaded Chen's belongings onto the moving truck, the Admiral representative handed Chen a bill of lading. (*Id.*; Chen Dep. at 262.)[6] The bill of lading stated that Mayflower "publishes tariffs which set forth

---

[5] As with the Handwritten Estimate, one of the dates on the Typed Estimate is not legible on the copy submitted to the court in connection with the instant motion (Typed Estimate at 1), but it is legible on previous copies submitted to the court in connection with other motions. *See, e.g.*, Def.'s LR Stmt. Supp. Def.'s Mot. Summ. J. Pendent Cts. 2nd Am. Compl., Ex. E. [Dkt. 74.]

[6] Although only a blank bill of lading was submitted to the court in connection with the instant motion (Def.'s LR App. Ex. A(7), Bill of Lading), Chen's bill of lading was submitted to the court in connection with a prior motion. *See* Pl.'s App. Exs. Opp'n Def.'s Mot. Summ. J.

the terms, conditions and prices for the transportation services it provides" and that "[t]he applicable tariff provisions are incorporated herein by reference." (Def.'s LR App. Ex. A(7), Bill of Lading at 2.) The bill of lading further stated that the tariff may be inspected at Mayflower's offices and that a copy of certain provisions would be provided upon request. (*Id.*) The bill of lading directed shippers to the "Your Rights and Responsibilities When You Move" pamphlet for more information about the tariff. (*Id.*) It also noted that "[i]n the event of any conflict between the terms of the Order for Service [presumably the Handwritten Estimate or the Typed Estimate] and Bill of Lading, the document last executed shall control." (*Id.*)

## C. The Delivery of Chen's Goods in Chicago

Chen's property was scheduled to be delivered between June 15 and June 21. (Handwritten Estimate at 1; Typed Estimate at 1; Admiral Letter to Chen.) Her property was to be delivered by Century Moving and Storage ("Century"), another moving company associated with Mayflower which is located in Illinois. (Def.'s LR Resp. ¶ 48; Pl.'s LR App. Ex. 24, Fleming Dep. at 19, 21.) Chen's property did not arrive until June 30, and Chen incurred over $1,100 in expenses for food and lodging while she waited for her shipment to arrive. (Def.'s LR Resp. ¶ 47.)

On the morning of June 30, before her property arrived, Chen received a call from Ann Vinyard, a representative from Century, who informed her that her property would be delivered that day between 11:00 a.m. and 1:00 p.m. (*Id.* ¶ 49; Chen Dep. at 233-34.) A few minutes later, Vinyard called again and asked Chen whether she had cash or a cashier's check for $1,741.89.

---

Pendent Cts. 2nd Am. Compl., Ex. J. [Dkt 79.] Chen's bill of lading lists the Total Estimate as "COD $1,741.89." *Id.* at 1. Chen signed and dated the bill of lading on June 10, 1999. (*Id.*; Chen Dep. at 263.)

(Chen Dep. at 235.) Chen responded that she would be paying by credit card, and that she had been told she had permission to pay by credit card. (*Id.*) Vinyard advised Chen that she would not be able to pay by credit card and that the driver could not unload her property unless she handed over cash, a cashier's check or a money order. (*Id.* at 235-36; Def.'s LR Resp. ¶ 49.) Chen told Vinyard that she would try to get a cash advance using her credit card. (Chen Dep. at 237.) Chen then attempted to get the cash together, but was unsuccessful in the short time period available. (*Id.* at 237-43; Def.'s LR Resp. ¶ 53.)[7]

After returning to her apartment, Chen called Vinyard and explained to her that she had been unable to raise the cash, but that she still intended to pay by credit card. (Chen Dep. at 246; Def.'s LR Resp. Ex. 6, Audiocassette Tr. at 2.)[8] Vinyard advised Chen that she needed to have obtained pre-approval from Admiral, the company that booked her move, to pay by credit card. (Audiocassette Tr. at 7, 13, 24-26.) Vinyard stated that Century would not allow its driver to unload Chen's property without receipt of certified funds for the full amount of the move, and that, in fact, Admiral had already authorized storage of the goods. (*Id.* at 2, 16.) Vinyard told Chen that if her goods were placed in storage, she would be charged for storage, delivery and warehouse handling costs. (*Id.* at 16.) In response to Chen's complaints, Vinyard said that Century's "hands [we]re tied

_____

[7] Chen's credit card company allowed Chen a cash advance limit of only $1400, and the first bank that Chen went to try to obtain that advance told her it did not perform cash advances on credit cards. (Chen Dep. at 237-39.) Chen did not locate any branches of her own bank. (*Id.* at 239-41.)

[8] Chen tape recorded several of her conversations with various Mayflower representatives that day. (Chen Dep. at 244-46, 269-70.) She decided to do so after her brother told her about a television program that he had seen regarding movers who demand cash at delivery, inflate the bill, and demand that customers sign a statement approving the extra charges before releasing the customer's goods. (*Id.* at 244-45.)

[because it was] just the hauling agent" and that it "didn't book [Chen's] order," and had very limited authority in that situation. (*Id.* at 2, 10, 16.)

After that conversation, at around 11:00 a.m., the driver of the truck arrived. *Chen,* 2002 WL 1632412 at *3 (citing Chen Dep. at 272). He told Chen that the truck was too wide for the street and that if a shuttle truck was necessary, Chen's bill would be twice as much. (*Id.*) The driver then called Vinyard from Chen's phone to explain the situation to her. (Chen Dep. at 300-03.) After their conversation, the driver handed the phone to Chen, and Vinyard informed Chen that, due to the additional services required, such as a "long carry" and the size of the elevator, the cost of the move had risen to around $2,500 – approximately $800 over Chen's "guaranteed not to exceed" estimate. (*Id.* at 303-04, 311; Def.'s LR Resp. ¶ 51; Audiocassette Tr. at 36.) Vinyard advised Chen, again, that unless she could raise that amount in cash, her goods would be put into storage and she would incur even more charges. (Chen Dep. at 304.) Chen was advised that those charges were for "warehouse delivery fees, the first month's rent, and a refundable deposit for the second month's rent." (Def.'s LR Resp. ¶ 51; Audiocassette Tr. at 37.)

While the truck driver was waiting, Chen called Corrine Swenson, a Mayflower customer service representative at the "800" number. (Chen Dep. at 315-16; Audiocassette Tr. at 21-29.) Swenson told Chen that payment by credit card had to be approved by the booking agent at least 48 hours before the goods were loaded. (Audiocassette Tr. at 22-23.) Swenson called Admiral to see if Admiral would approve Chen's credit card and reported that Admiral refused. (*Id.* at 24-26.)

A little bit later, Vinyard called Chen to check on the progress of the move. (*Id.* at 29.) After Chen advised her that she thought she could obtain the cash to pay for the move with just a little more time, Vinyard advised her that each additional hour that the truck driver had to wait would cost

Chen $84.50. (*Id.* at 29, 33-34, 36.) Vinyard also told Chen that the driver would not unload her goods unless she signed an addendum approving the additional charges including waiting time, stairs and long carries. (Audiocassette Tr. at 30, 36.) When Chen complained about the additional charges, Vinyard directed Chen to the portion of the Estimate/Order for Service form that stated: "If items are added . . . or additional services are performed, additional cost may result." (*Id.* at 35.) Vinyard then told Chen that the price had now risen to $2,556.69 plus an hour of waiting time at $84.50 – or a total of $2,641.19 – and stated that if Chen's goods went into storage, Chen would need to raise nearly twice as much, namely, an additional $1,555 for delivery to storage, $249.60 for warehouse handling, $667.04 for the first two months of storage, and undisclosed amounts for delivery out of storage. (*Id.* at 37-38, 47.) Chen was also told that if she did not pay that sum within 30 days, her goods would be sold at auction after 30 days. (*Id.* at 37-38.)

At 2:30 p.m., Chen called Vinyard and told her that she had raised about $1,100 in cash. (*Id.* at 39, 41.)[9] Vinyard advised Chen that she was on the other line with "headquarters" and that they decided to put Chen's shipment in storage. (*Id.* at 39.) Vinyard told Chen that her total charges now stood at $5,122.83, not including the cost of delivery out of storage. (*Id.* at 48; Def.'s LR Resp. ¶ 52.) Vinyard told Chen that the "owner of the company" would give her "a really big discount" and deliver the goods on July 6th if Chen could come up with a cashier's check for $1,741.89 plus $2,240 for storage and delivery out of storage – a total of $3,981.89. (Audiocassette Tr. at 51-52.)

Chen's goods were put into storage where they remained for approximately three months, until after Chen filed a motion for preliminary injunction. (Def.'s LR Resp. ¶ 55.) It was

---

[9] Chen was able to withdraw $1,000 with her ATM cards and had about $100 in cash on her person. (Chen Dep. at 313.)

subsequently determined that the additional costs (including loading, transportation, storage for 97 days, and final unloading) amounted to $3,521.28, not $5,122.83 or $3,981.89 as quoted previously. (*Id.* ¶ 56; Audiocassette Tr. at 51-52.)

## II.     The Relationship between Mayflower and the Local Moving Companies

Mayflower is federally licensed as an interstate motor carrier and has been for over 75 years. (Pl.'s LR Resp. ¶ 1.)  Mayflower itself does not sell moves to individual shippers, physically move household goods, provide estimates, own trucks, or employ drivers or laborers to perform moving services.[10]  (*Id.* ¶ 6; Def.'s LR Resp. ¶ 1.)  Rather, it enters into agreements with independently owned and managed local moving companies to sell moving services.  (Def.'s LR Resp. ¶ 2; Pl.'s LR Resp. ¶ 3.)  Mayflower presently has agreements with approximately 400 local moving companies.  (Pl.'s LR Resp. ¶ 3.)  Those companies are permitted to use Mayflower's name and logo.  (Def.'s LR App. Ex. A(2), Agency Agreement at 2; Def.'s LR Resp. ¶ 2; Pl.'s LR Resp. ¶ 9.) The moving work is performed by drivers who are employed by the affiliate companies using trucks that are owned or leased by the affiliates.  (Pl.'s LR Resp. ¶¶ 6, 7.)  Mayflower provides those companies with a centralized communications system to coordinate moves, billing and collection services, a customer service department, and the federal authority to operate interstate.  (Def.'s LR Resp. ¶¶ 4, 11.)  Mayflower occasionally placates complaining customers by providing them with checks, or refers the customer to the affiliate who provided the service for information.  (*Id.* ¶ 12.)

Mayflower distributes the revenue collected for a given shipment among the agent booking

---

[10]  In the terminology employed by the parties, the individuals whose goods are being moved are referred to as "shippers."

the shipment, the origin agent, and the hauling agent, with Mayflower retaining on average 13% of the charges for the actual transportation of the shipment. (Pl.'s LR Resp. ¶ 13.) When cash is collected by an affiliate at delivery, the funds are retained by the affiliate but the affiliate enters the amount collected into Mayflower's system and that amount is posted as a debit against the affiliate's account. (*Id.* ¶ 12.) When Mayflower distributes the revenue from a shipment to the affiliate who provided the service, the revenue is posted to the affiliate's statement as a credit. (*Id.*) The accounts of the individual affiliates are cleared on a weekly basis and payment is made either to or from Mayflower. (*Id.*) Charges that are levied in addition to the estimate (*i.e.*, charges that exceed the estimate) are also collected and distributed by Mayflower. (Def.'s LR Resp. ¶ 15.) Credit card payments are collected directly by Mayflower, although there are some exceptions. (Pl.'s LR Resp. ¶¶ 10-12.) Generally, shippers must obtain preapproval of their credit cards before they may use them to pay for services. (Webb Dep. at 114-17.) On an infrequent basis, shippers are permitted to pay at the point of destination without having obtained preapproval of their credit cards. (Pl.'s LR Resp. ¶ 17) (citing Webb Dep. at 185-86.) Under Mayflower's policy, shippers seeking preapproval of their credit cards must generally submit their cards to the booking affiliate companies, who in turn transmit the data to Mayflower's central credit department. (Pl.'s LR Resp. ¶ 17.)

The terms "not to exceed" and "guaranteed not to exceed" are used on occasion by at least some of the local moving companies when booking shipments. (Def.'s LR Resp. ¶¶ 17, 18.) Mayflower is aware that its affiliates use phrases such as "not to exceed" and "guaranteed price" to describe estimates to prospective shippers, and it does not discourage them from doing so. (*Id.* ¶ 20.) Mayflower and the affiliates know that some shippers are not clear that Mayflower does not intend for the shipper's estimate to be an absolute cap on cost when the words "not to exceed" or

"guaranteed price" are used with an estimate. (Pl.'s LR App. Ex. 4, Witherington Dep. at 215; Fleming Dep. at 265-66.)

Shippers with binding estimates can be asked to pay additional amounts at the point of origin or destination. (Webb Dep. at 65-69, 80-82.) At the point of origin, shippers with binding estimates can be required to pay extra amounts to cover necessary services omitted by the booking affiliate company. (*Id.* at 71.) The need for those services can be made known to the shipper as late as the day of the move. (*Id.* at 67; Pl.'s LR App. Ex. 17, Reece Dep. at 21-23.) If a shipper refuses to pay additional amounts imposed at the point of origin, the affiliate may refuse to move the goods. (Webb Dep. at 67-68.) If additional services and payments are required at the destination, the shipper theoretically has three choices: (1) pay for the additional services; (2) pay to have the goods placed in storage; or (3) have the goods unloaded right where they are. (*Id.* at 80-81.) Mayflower does not specifically instruct affiliates to offer shippers the last option, *i.e.,* unloading the goods right where they are. (*Id.* at 82-83.) At the destination, Mayflower's typical procedure is that a shipper's goods will not be unloaded until all additional services required have been paid for. (*Id.* at 121-122.) Drivers understand that they are not supposed to open the door of their van until they collect any and all additional amounts allegedly owed. (*Id.* at 122; Def.'s LR Resp. ¶ 24.)

The local moving companies continue to conduct local (*i.e.,* in-state) moves under their own authority, and keep that business completely separate from their relationship with Mayflower. (Webb Dep. at 174-75.) When conducting local moves, local moving companies may identify themselves as Mayflower affiliates and use trucks with the Mayflower logo, but must explain that, for local moves, they are not "Mayflower." (*Id.* at 175-76.) Storage of property also falls outside the affiliates' relationships with Mayflower. (Fleming Dep. at 23-24.) Admiral and Century engage

in significant business outside of their relationship with Mayflower. (*Id.* at 25-26; Pl.'s LR App. Ex. 26, Sibila Dep. at 26-27.) Mayflower does not have any control over the conduct of that business. (Fleming Dep. at 26; Sibila Dep. at 26-27.)

## III.  Documents Cited by Mayflower

Besides the Handwritten and Typewritten Estimates discussed above, two other documents pertaining to Chen's move warrant discussion: (1) the tariff; and (2) the pamphlet entitled "Your Rights and Responsibilities When You Move."

### A.  The Tariff

The Handwritten Estimate states that the "rules, rates and form of Bill of Lading in Carrier's Tariff *on file* with the Surface Transportation Board" are incorporated by reference. (Handwritten Estimate at 2) (emphasis added.) It also provides that "[t]he rules, regulations and carrier's Provisions regarding estimates set out in the Tariff currently in effect on the date applicable *as filed with the Surface Transportation Board* of the Department of Transportation shall govern this shipment." (*Id.*) (emphasis added.)

Mayflower asserts that it is governed by Tariff 400-M (which applies to the industry as a whole) and Tariff 104-F, the "Exceptions" tariff (which is specific to Mayflower). (Def.'s Mem. at 19-20.) Mayflower's tariff is published by a branch of the American Moving and Storage Association. (Def.'s LR Resp. ¶ 158.) A Mayflower representative testified that the tariff is not drafted or approved by any public administrative agency or passed by Congress. (Pl.'s LR App. Ex. 3, Pullaro Dep. at 174.) Mayflower can publish exceptions to the tariff on its own initiative, and

neither the tariff nor the exceptions are filed with any public agency. (Pullaro Dep. at 163-64, 168, 173.) Mayflower is not aware of any public distribution of the tariff. (*Id.* at 173.) In recent times, tariffs are "published" on compact disc due to the bulk of the tariffs. (Def.'s LR App. Ex. C, Pullaro Aff. ¶ 5.) At oral argument on Mayflower's motion, Mayflower's counsel appeared surprised by the suggestion that anyone would actually request a copy of the tariff. Mayflower's counsel noted that the tariff is complex and must be studied thoroughly to be understood. The tariff does not define the phrase "not to exceed." (Webb Dep. at 48.)

### B.     The "Your Rights and Responsibilities When You Move" Pamphlet

It is Admiral's policy to provide shippers with a copy of the pamphlet "Your Rights and Responsibilities When You Move" at the time an estimate is provided. (Sibila Dep. at 110-111.) The text of that document can be changed only with the permission of the Federal Motor Carrier Safety Administration. 49 C.F.R. § 375.213(b)(1). The document must be distributed to potential shippers prior to the execution of an order for service of a shipment of household goods. *Id.* at § 375.213(a)(1). The document explains the binding estimate provision. (Def.'s LR App. Ex. D(2), "Your Rights and Responsibilities When You Move," Form OCE-100 at 2.)[11]  It also informs

---

[11]  Specifically, the document states:

When you receive a binding estimate, you cannot be required to pay any more than that amount. However, if you have requested the mover to provide more services than those included in the estimate, such as destination charges (i.e., long carry charges, shuttle charges, extra stair carry charges, or elevator charges) often not known at origin, the mover may demand full payment for those added services at time of delivery.

To be effective, a binding estimate must be in writing and a copy must be made available to you before you move.

shippers that they can inspect the tariff at the carrier's facility. (*Id.* at 1.) Chen testified that she did not receive a copy of the "Your Rights and Responsibilities When You Move" pamphlet. (Chen Dep. at 215.) The document does not discuss the phrase "not to exceed."

## IV.    Other Individuals with Similar Experiences

Chen has identified eighteen other individuals whom she claims had experiences similar to hers with Mayflower and its affiliates. (Pl.'s LR Stmt. ¶¶ 58-157; Pl.'s LR App. Exs. 8-23, 25, 31-48.)[12] Richard Stevens, for example, was told that the price of his estimate was fixed and "couldn't be increased by anything that happened." (Pl.'s LR App. Ex. 8, Stevens Dep. at 26.) However, the affiliate conducting Stevens' move sought additional payment after it determined that the quantity of goods to be moved had been underestimated and there were costs that had not been included in the estimate. (*Id.* at 29, 33.) Stevens' price was increased after most of his property had been loaded. (*Id.*) Marc Reece was given a "not to exceed estimate" and told "[t]hat's what 'not-to-exceed' means; there are no other charges." (Reece Dep. at 13, 15.) Although an estimator had been to his house, he was told on the day of the move that a shuttle would be required and he would be

---

If you agree to a binding estimate, you are responsible for paying the charges due by cash, certified check, traveler's check, or bank check (one drawn by a bank on itself and signed by an officer of the bank) at time of delivery unless the mover agrees before you move to extend credit or to accept payment by charge card. If you are unable to pay at the time the shipment is delivered, the mover may place your shipment in storage at your expense until the charges are paid.

(*Id.*)

[12]    Those individuals are: Richard Stevens, Jan Figa, Marc Reece, Marilyn Lapka, Craig Pietrowiak, Michael Daniels, Peter and Christine Lucke, Mitchell McCloskey, Alan Gross, Marilyn Rankin, Richard Feasel, Cheryl Carlucci, Bassel Nabelssi, Renee Vonderhaar, Ed Hershey, Kavita Amar and Beverly Place. (*Id.*)

charged an additional amount. (*Id.* at 21-22.) He was told that he must pay the increased price or his property would not be moved. (*Id.* at 22.) Mitchell McCloskey was also given a "not to exceed proposal." (Pl.'s LR App. Ex. 35, McCloskey Aff. at 1.) His written proposal stated that "[t]he shipment will be weighed and the charges for service will be based on the actual weight and services performed or $1,555.37, whichever is less." (*Id.*) When the movers arrived at his new residence, he was told that his property would not be unloaded unless he paid an increased price to cover "the excessive distance from [his] residence to the moving truck." (*Id.*) Peter and Christine Lucke were told that the final cost of their move would "under no circumstances" exceed the guaranteed price estimate. (Pl.'s LR App. Ex. 33, Lucke Aff. at 1.) When their goods were half-loaded, they were told they must pay an increased price since the amount they were moving had been underestimated. (*Id.*) Those acts took place between 1998 and 2001. (Pl.'s LR Stmt. ¶¶ 58-67, 77-85, 111-118; Pl.'s LR App. Exs. 8, 12, 17-19, 33-36.)

## LEGAL STANDARD

The court may properly grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material fact exists, the court must construe all facts and draw all reasonable and justifiable inferences in favor of the non-moving party. *Id.* at 255. The moving party bears the initial burden to demonstrate the absence of a genuine

issue of material fact and that judgment as a matter of law should be granted in the moving party's favor. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met the initial burden, the non-moving party must designate specific facts showing that there is a genuine issue for trial. *Id.* at 324. The non-moving party must support its contentions with admissible evidence and may not rest upon the mere allegations in the pleadings or conclusory statements in affidavits. *Id.* See also *Winskunas v. Birnbaum*, 23 F.3d 1264 (7th Cir. 1994) (non-moving party is required to present evidence of "evidentiary quality" (i.e. admissible documents or attested testimony, such as that found in depositions or in affidavits) demonstrating the existence of a genuine issue of material fact). "[N]either 'the mere existence of some alleged factual dispute between the parties' . . . nor the existence of 'some metaphysical doubt as to the material facts,' is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Group, Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (quoting *Anderson*, 477 U.S. at 247 and *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Thus, "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252.


## DISCUSSION

I.     **Mayflower's Motion for Summary Judgment**

Section 1962(c) of RICO provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c). Section 1962(d) of RICO provides:

> It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

*Id.* at § 1962(d).

To state a claim under § 1962(c), a RICO plaintiff must show the "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Richmond v. Nationwide Cassel L.P.*, 52 F.3d 640, 644 (7th Cir. 1995) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)). In its motion, Mayflower claims that it is entitled to summary judgment on Chen's RICO count because Chen cannot establish: (1) the existence of an enterprise distinct from Mayflower or that Mayflower conducted or participated in the enterprise; (2) a pattern of racketeering activity; or (3) the illegality of conduct complained of or the existence of a predicate act.

As discussed below, the court concludes that Chen has established facts from which a jury could find that Mayflower has violated RICO. Thus, Mayflower's motion for summary judgment is denied.

### A.    Existence of a RICO Enterprise

#### 1.    *Distinctness between Mayflower and the Enterprise*

Liability under RICO depends upon a showing that two distinct entities exist: "(1) a 'person;' and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001). *See also Haroco, Inc. v. American Natl. Bank & Trust Co. of Chicago*, 747 F.2d 384, 402 (7th Cir. 1984) (Section 1962(c) "requires

only some separate and distinct existence for the person and the enterprise").[13] "There need be shown 'only some separate and distinct existence for the person and the enterprise.'" *Gagan v. American Cablevision, Inc.*, 77 F.3d 951, 964 (7th Cir. 1996) (quoting *Ashland Oil, Inc. v. Arnett*, 875 F.2d 1271, 1280 (7th Cir. 1989)).

Mayflower argues that Chen cannot demonstrate that Mayflower – the "person" she alleges is liable to her under RICO – is sufficiently distinct from the enterprise identified by Chen, *i.e.*, Mayflower and the local moving companies with which it does business. (Def.'s Mot. ¶ 1; Def.'s Mem. at 2, 4-10.) Mayflower argues that the enterprise is insufficiently distinct from Mayflower because "the alleged enterprise consists only of Mayflower and its agents acting within the scope of their authority as agents." (Def.'s Mem. at 5.) Mayflower further argues that there is no distinct enterprise because the one identified by Chen does not bear a "family resemblance" to the prototypical RICO case. (*Id.* at 5-6.) Mayflower claims that the Seventh Circuit has "repeatedly held" that "a combination of various members of a corporate family cannot constitute a distinct enterprise." (*Id.* at 5.) In this regard, Mayflower argues that it merely deals with its agents in an ordinary way, so that the agents' role in the enterprise is merely incidental. (*Id.* at 7-8.) Chen responds that the enterprise and Mayflower are legally different entities with different rights and responsibilities and roles to play. (Pl.'s Opp'n at 6-8.) Chen further argues that it is irrelevant whether the local moving companies acted within the scope of their authority as agents (*id.* at 7), and

---

[13] "[E]nterprise," as defined in the statute, "includes any individual, partnership, corporation, association, or other legal entity . . . ." 18 U.S.C. § 1961(4). The Seventh Circuit has characterized a RICO enterprise as "an ongoing 'structure' of persons associated through time, joined in purpose, and organized in a manner amenable to hierarchical or consensual decision-making." *Richmond*, 52 F.3d at 644 (quoting *Jennings v. Emry*, 910 F.2d 1434, 1440 (7th Cir. 1990)).

that the agents' role in the enterprise is not entirely incidental. (*Id.* at 7-8.) Mayflower replies that it is not enough that the enterprise and Mayflower play distinct roles; rather, the person (Mayflower) must control the enterprise in some way. (Def.'s Reply at 3-4.) Mayflower further argues that the fact that the local moving companies are "independent corporations, incorporated in different states, with different ownership from Mayflower and, generally, from each other" is meaningless in the distinctiveness analysis. (*Id.* at 5.)

In *Fitzgerald v. Chrysler Corp.*, 116 F.3d 225 (7th Cir. 1997), the Seventh Circuit affirmed the dismissal of the plaintiff's RICO claim based on its finding that the agents' role in the defendant's illegal acts was entirely incidental and thus there was no enterprise. Specifically, the court concluded: "[W]here a large, reputable manufacturer deals with its dealers and other agents in the ordinary way, so that their role in the manufacturer's illegal acts is entirely incidental, differing not at all from what it would be if these agents were the employees of a totally integrated enterprise, the manufacturer plus its dealers and other agents (or any subset of the members of the corporate family) do not constitute an enterprise within the meaning of the statute." *Id.* at 228. The court further indicated that the defendant-person (Chrysler) had not been "empowered to perpetrate warranty fraud by selling through dealers rather than directly to the public." *Id.* at 227. The holding in *Fitzgerald* was in line with the Seventh Circuit's prior endorsement of the analysis employed by the Third Circuit in *Brittingham v. Mobil Corp.*, 943 F.2d 297 (3d Cir. 1991), which stated that an an enterprise must be "more than an association of individuals or entities conducting the normal affairs of a defendant corporation." *See Richmond*, 52 F.3d at 647 (quoting *Brittingham*, 943 F.2d

at 301-302).[14]

However, in *Fitzgerald*, the court held open the possibility that a corporation and its agents or affiliates could constitute a RICO enterprise: "Maybe a manufacturer could use its dealers or other agents or affiliates in such a way as to bring about the sort of abuse at which RICO is aimed, in which event it might be possible to characterize the assemblage as a RICO enterprise." 116 F.3d at 228. Thus, the fact that the local moving companies may be deemed "agents" or "affiliates" of Mayflower does not by itself preclude Chen from establishing her RICO claim. In determining whether the distinctiveness requirement is met, the court noted in *Fitzgerald* that it was helpful to consider the "family resemblance" between the case at hand and "the prototype situation to which the [RICO] statute is addressed." *Id*. at 227.[15] The Seventh Circuit has described the "prototypical RICO case" as one in which a criminal "seizes control of a previously legitimate firm and uses the firm's resources, contacts, facilities, and appearance of legitimacy to perpetrate more, and less easily discovered, criminal acts than he could do in his own person . . . ." *Id*. at 227. *See also Emery v. American General Finance, Inc.*, 134 F.3d 1321, 1324 (7th Cir. 1998) (stating that to meet the distinct enterprise requirement, "the firm must be shown to use its agents or affiliates in a way that

---

[14] Although the "distinctiveness" analysis set forth by the Third Circuit in *Brittingham* was subsequently called into question by that Circuit's holding in *Jaguar Cars, Inc. v. Royal Oaks Motor Car Co.*, 46 F.3d 258 (3d Cir. 1995), courts in this District have continued to rely on the *Brittingham* analysis because it was expressly accepted by the Seventh Circuit in *Richmond*, notwithstanding the *Jaguar Cars* decision. *See Fitzgerald v. Chrysler Corp.*, No. 96 C 0021, 1996 WL 473456 at *5 n.5 (N.D. Ill. Aug. 16, 1996) (Marovich, J.); *Ewing v. Midland Finance Company*, No. 96 C 222, 1997 WL 627644 at *5 (N.D. Ill. Sept. 26, 1997) (Manning, J.).

[15] The family resemblance test has been used in this Circuit to resolve the "definitional complexities" of the word "pattern" in RICO. *Fujisawa Pharm. Co., Ltd. v. Kapoor*, 115 F.3d 1332, 1338 (7th Cir. 1997); *see also Shapo v. O'Shaughessy*, 246 F. Supp. 2d 935, 959 (N.D. Ill. 2002).

bears at least a family resemblance to the paradigmatic RICO case in which a criminal obtains control of a legitimate (or legitimate-appearing) firm and uses the firm as the instrument of his criminality"). The Seventh Circuit recognized, however, that when an enterprise is used to engage in some criminal activity but, for the most part, conducts normal and lawful business, it is only one step away from the prototypical case. *Fitzgerald*, 116 F.3d at 227. Presumably, such an enterprise is within the family resemblance test.

In *Cedric Kushner*, which was decided several years after *Fitzgerald*, the Supreme Court held that an individual and his wholly owned corporation could be sufficiently distinct for RICO purposes. 533 U.S. at 163, 166. The Court in *Cedric Kushner* concluded that the corporate owner/employee was distinct from his corporation because the corporation was "a legally different entity with different rights and responsibilities due to its different legal status," and the Court could "find nothing in the statute that requires more 'separateness' than that." *Id.* at 163. The Court observed that, "[a]fter all, incorporation's basic purpose is to create a distinct legal entity, with legal rights, obligations, powers, and privileges different from those of the natural individuals who created it, who own it, or whom it employs." *Id.*

In *Bucklew v. Hawkins, Ash, Baptie & Co., LLP*, 329 F.3d 923 (7th Cir. 2003), which was decided subsequent to *Cedric Kushner*, the Seventh Circuit affirmed judgment in favor of the defendant on a RICO claim involving a parent corporation and its wholly owned subsidiaries. In deciding the issue, the court stated: "A parent and its wholly owned subsidiaries no more have sufficient distinctiveness to trigger RICO liability than to trigger liability for conspiring in violation of the Sherman Act . . . unless the enterprise's decision to operate through subsidiaries rather than divisions somehow facilitated its unlawful activity, which has not been shown here." *Id.* at 934

(citations omitted). *Bucklew* suggests that, although a parent corporation and its subsidiaries will generally not meet the distinctiveness requirement, they may be found distinct if the unlawful activity is facilitated by the enterprise's decision to operate through subsidiaries. *Id.*

None of the person-enterprise relationships in the cases discussed above is identical to the relationship between the person (Mayflower) and the enterprise (Mayflower and the local moving companies with which it affiliates) identified by Chen in this case. Mayflower has not cited a case showing that the distinctiveness requirement cannot be met by the relationship between Mayflower and the enterprise in this case. The court finds that Chen has produced evidence establishing that Mayflower and the enterprise may be distinct entities. First, the enterprise is not simply Mayflower by another name. The relationship between Mayflower and the other participants in the enterprise is not employer-employee or parent-subsidiary. The agreement between Mayflower and its affiliates specifically notes that "[t]he parties agree that they have not established a partnership, cooperative, joint venture, franchise or any other business relationship." (Agency Agreement at 5.) In addition, Chen has produced evidence that the affiliates associated with her move do significant business entirely apart from their relationship with Mayflower. Doug Sibila, a representative of Admiral, testified that only 50-60% of its revenue is based on its work derived from its relationship with Mayflower, and that the figure may be less in some years. (Sibila Dep. at 26.) Likewise, Robert Fleming, a representative of Century, testified that approximately 55% of Century's businss, such as local and international moving, packing and unpacking, and storage, is separate from its business with Mayflower. (Fleming Dep. at 23-26.)

Further, Chen has produced evidence that Mayflower and the enterprise each play a distinct role within the purported scheme. For instance, the evidence shows that the local moving companies

conduct activities for the enterprise such as booking shipments, issuing estimates, providing local marketing services, determining (within an authorized range) what discounts to offer, performing physical services such as packing, unpacking, hauling, loading, unloading, storing the goods, and contributing movers and trucks, which Mayflower does not do. (Def.'s LR Resp. ¶¶ 1, 9; Pl.'s LR Resp. ¶ 6; Webb Dep. at 37, 170-71, 180-82.) Conversely, Mayflower provides the centralized communication system via interstate wire to coordinate moves, provides a customer service department for the shippers, oversees operations, provides guidelines regarding discounts that may be offered by the affiliates, processes payments in connection with the moves (*e.g.*, processes credit transactions and collects and disburses the receipts from the shipments to other participants in the enterprise), provides the federal authority to operate interstate and contributes its name. (Def.'s LR Resp. ¶¶ 3, 4, 7, 11, 15; Pl.'s LR Resp. ¶¶ 10, 12, 17; Webb Dep. at 172, 177-78, 180-81, 184, 187.) The evidence that the two entities play distinct roles and had different rights and responsibilities is important in the distinctness analysis. *See Cedric Kushner*, 533 U.S. at 163 (finding corporate owner distinct from corporation which was a legally different entity with different rights and responsibilities).

Additionally, unlike the plaintiffs in *Fitzgerald* and in *Baker v. IBP, Inc.*, 357 F.3d 685 (7th Cir. 2004), another RICO case recently before the Seventh Circuit, Chen has produced evidence indicating that the enterprise is more than simply an association that conducts the normal affairs of the RICO person (Mayflower).[16] Specifically, the enterprise's alleged activity is extorting money

---

[16] In the *Baker* case, the allegedly illegal activity – the hiring, harboring and paying of illegal workers to reduce the employer's payroll – was committed by the corporate employer alone, not the enterprise; thus, the complaint alleged that the employer operated *itself*, not the enterprise, unlawfully. 357 F.3d at 691.

for additional origin and destination service charges and providing fraudulently low estimates. The enterprise does not constitute Mayflower's regular business because Mayflower does not physically conduct moves, decide to impose the additional charges or share in the charges collected from the "additional services," including shuttles, long carries, and stair and elevator charges; only the enterprise does. (Def.'s LR Resp. ¶¶ 1, 16, 33, 38; Pl.'s LR Resp. ¶ 6; Webb Dep. at 67, 103, 182, 184-85; Fleming Dep. at 82-83.)

Chen has also produced sufficient evidence that Mayflower does not deal with its affiliates in merely the "ordinary way." *Cf. Fitzgerald*, 116 F.3d at 228 (court found that where the agents' role in the enterprise's illegal acts is entirely incidental, differing in no way from what it would be if the agents were the employees of a totally integrated enterprise, there is no "enterprise" within the meaning of the RICO statute). Rather, in the present case, the affiliates can determine on their own what additional services are necessary (at additional cost to the shippers) and can then collect payment for those additional services. (Webb Dep. at 182-83.) Indeed, the evidence produced shows that the success of the enterprise may *depend* on the distinctness between Mayflower and the enterprise; specifically, the use of the local moving companies as agents or affiliates permitted the enterprise to take Chen's goods under the representation that certain terms would be met, and then use the fact that her goods were being handled by a different local company as a basis to refuse to honor the agreement made with Chen and to require additional improper payments from Chen. (*See* Chen Dep. at 196-98, 304; Audiocassette Tr. at 2, 6, 10, 16, 37-38; Pl.'s LR App. Ex. 27, Vinyard Dep. at 102.) For instance, when Century's representative refused to accept Chen's credit card, she did so on the basis that they "didn't book [Chen's] order." (Audiocassette Tr. at 2.) Likewise, when Chen complained to Mayflower's customer service representative, Mayflower's representative told

Chen that Admiral (the booking agent) refused to approve Chen's credit card. (*Id.* at 24-26.) That evidence indicates that by working through the enterprise, Mayflower was enabled to engage in the alleged racketeering activity in a way that would be impossible if Mayflower had internalized the agent-affiliate function. *Cf. Fitzgerald*, 116 F.3d at 228. Put differently, the person-enterprise relationship in this case may have "empowered [Mayflower] to perpetrate . . . fraud by selling through [its affiliates] rather than directly to the public." *Id.* at 227. *See also Emery*, 134 F.3d at 1324 (affirming dismissal where there was "no allegation that by using subsidiaries rather than divisions [the defendants] somehow made it easier to commit or conceal the fraud of which the plaintiff complains"). Thus, Chen has produced evidence tending to show that more than Mayflower's "normal affairs" were being conducted by the enterprise, namely, the extortion and sharing of improper additional amounts beyond the initial estimates that would have been proper compensation for the move.[17]

Finally, as discussed in more detail below, Chen has produced sufficient evidence that Mayflower directs or controls the enterprise. *See Emery*, 134 F.3d at 1325. All of these facts establish that Mayflower may be sufficiently distinct from the enterprise identified by Chen. Thus, summary judgment cannot be granted on this ground.

---

[17] As mentioned earlier, Mayflower also argued that the distinctness requirement could not be met because the enterprise consisted only of Mayflower and its agents "acting within the scope of their authority as agents." (Def.'s Mem. at 5.) However, as Chen points out, it makes no difference whether participants in a RICO enterprise act within or beyond the scope of their authority as agents. *See Cedric Kushner*, 533 U.S. at 165 (stating that the "distinction – between employees acting within the scope of corporate authority and those acting outside that authority – is inconsistent with a basic [RICO] statutory purpose").

## 2. *Mayflower's Conduct or Participation in the Enterprise's Affairs*

Liability under RICO depends on a showing that the defendant "conducted or participated in the conduct of the '*enterprise's* affairs' not just [its] *own* affairs." *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993). To "'participate, directly or indirectly, in the conduct of such enterprise's affairs,' one must have some part in directing those affairs." *Id.* at 179 (quoting 18 U.S.C. § 1962(c)). "In other words, [the defendant] must have participated in the operation or management of the enterprise itself." *United States v. Swan*, 250 F.3d 495, 498 (7th Cir. 2000).

### a.    The Enterprise's Affairs

Mayflower argues that Chen cannot establish that the alleged wrongdoing was performed on behalf of the enterprise rather than on behalf of Mayflower because Mayflower's participation in the enterprise's operation (*e.g.*, by providing centralized communications and customer services and collecting payments) consisted of "everyday business functions" of Mayflower. (Def.'s Mem. at 12.) Chen asserts that she has produced evidence establishing that the alleged wrongdoing was not solely the business of Mayflower, but, instead, was the business of the Mayflower-enterprise. (Pl.'s Opp'n at 12.)

The requirement that a RICO defendant have engaged in the enterprise's affairs rather than just its own is simply another reference to the fact that a RICO defendant must be distinct from the alleged enterprise. *See Stachon v. United Consumers Club, Inc.*, 229 F.3d 673, 676 n. 3 (7th Cir. 2000) (stating that "the court has consistently insisted that the RICO defendant or person be separate and distinct from the enterprise . . . because liability depends on showing that the defendants conducted or participated in the conduct of the enterprise's affairs, not just their own affairs")

27

(quotations omitted); *Cedric Kushner*, 533 U.S. at 163 (discussing, as part of the distinctness analysis, the principle that liability depends on a showing that the defendant conducted or participated in the enterprise's affairs rather than its own affairs).

Here, Chen has established facts which could support a conclusion that the alleged wrongdoing (Mayflower's collection and distribution of money obtained through fraud, extortion and theft) was performed on behalf of the enterprise rather than Mayflower and, therefore, was not solely Mayflower's "own affairs." For instance, Mayflower is not in the business of issuing estimates to shippers. (Def.'s LR Resp. ¶ 1.) Thus, the enterprise's activity of issuing misleadingly low estimates to shippers (fraud) cannot constitute Mayflower's "own affairs." Similarly, Mayflower is not in the business of picking up or delivering shippers' property (indeed, it does not even have the trucks or laborers to perform such services). (*Id.*; Pl.'s LR Resp. ¶ 6.) Thus, the enterprise's activity of refusing to load or unload a shipper's property until additional charges have been paid (extortion and theft) cannot constitute Mayflower's "own affairs." Although some of the activities conducted by Mayflower may be "everyday business functions," as Mayflower contends, the facts discussed above suggest that Mayflower nevertheless conducted or participated in the conduct of the "enterprise's affairs," as required by the RICO statute.[18]

*Richmond* and *Atkinson v. Anadarko Bank & Trust Co.*, 808 F.2d 438 (5th Cir. 1987), two cases cited by Mayflower in support of its argument, are distinguishable. (Def.'s Mem. at 11-12.) In *Richmond*, the court affirmed the dismissal of the complaint because there was no showing that

---

[18] For example, while Mayflower's activity of maintaining communication with regional agents may indeed be an "everyday affair" and one that is critical to its own ongoing operations, that fact does not preclude a conclusion that Mayflower engaged in those same activities on behalf of the enterprise.

the defendants conducted the affairs of either of the alleged enterprises, rather than their own affairs, through a pattern of racketeering. 52 F.3d at 647. In *Atkinson*, the court affirmed the district court's decision to grant judgment notwithstanding the verdict based on its finding that the alleged RICO violation (the mailing of false loan statements) was solely an activity of the bank and there was no evidence of any other activity on the part of the alleged enterprise. 808 F.2d at 441. In contrast, here, as discussed above, there is evidence that the defendant conducted the enterprise's affairs in addition to its own.

### b. Operation or Management of the Enterprise's Affairs

Mayflower also argues that it does not direct or control the enterprise. (Def.'s Reply at 3, 10-11.) Mayflower asserts that, in fact, it is the local moving company *affiliates* who committed the predicate acts alleged and that those affiliates are not controlled by Mayflower. (*Id.* at 10.) Citing *Reves*, Chen argues that the purpose of the "operation or management" test is to prevent the RICO statute from reaching "complete outsiders," and that Mayflower is not a "complete outsider" to the enterprise, but rather its "center point." (Pl.'s Opp'n at 11) (citing *Reves*, 507 U.S. at 185).[19]

In *Goren v. New Vision International, Inc.*, 156 F.3d 721, 727-28 (7th Cir. 1998), the Seventh Circuit observed that the mere existence of a business relationship between the enterprise and the defendant is not sufficient to meet the operation and management test. The court stated that "simply

---

[19] In *Reves*, the Court stated that "§ 1962(c) cannot be interpreted to reach complete 'outsiders' because liability depends on showing that the defendants conducted or participated in the conduct of the '*enterprise's* affairs,' not just their *own* affairs. Of course, 'outsiders' may be liable under § 1962(c) if they are 'associated with' an enterprise and participate in the conduct of *its* affairs – that is, participate in the operation or management of the enterprise itself . . . ." 507 U.S. at 185.

performing services for an enterprise, even with knowledge of the enterprise's illicit nature, is not enough to subject an individual to RICO liability . . . ." *Id.* at 728. Similarly, in *Swan*, the Seventh Circuit concluded that receiving a ghost payroll check, taking on clients who were improperly referred by an alderman, failing to file tax returns and using a false Social Security card did not prove that the defendant operated or managed the alleged enterprise (the City of Chicago). 250 F.3d at 499 (reversing a RICO conviction because the district court failed to properly instruct the jury that RICO requires a finding of operation or management of the enterprise).

In the present case, Chen has established facts indicating that, unlike the defendants in the aforementioned cases, Mayflower does participate in the operation or management of the enterprise. The evidence produced shows that Mayflower develops policies and procedures, which its affiliates are required to follow. (Pl.'s LR Resp. ¶ 3.) Mayflower directly controls the customer service department and the disbursement of funds to the local moving company affiliates, including the disbursement of the amounts received for the additional origin and destination charges. (Def.'s LR Resp. ¶¶ 4, 11, 15, 16; Webb Dep. at 172.) Mayflower also provides its name to the enterprise. (Agency Agreement at 2.) Mayflower is the link between the booking agent who provides the allegedly fraudulent estimate and the hauling agent who extracts the additional charges.

In addition, although Mayflower argues that its participation was limited to merely performing services for the enterprise because it was the local moving company agents who committed the alleged predicate acts (*e.g.*, issued fraudulent estimates and unilaterally imposed higher charges at the point of origin or destination), the evidence shows otherwise. Mayflower issues the policies, procedure and guidelines which permits the alleged predicate acts to be committed. Mayflower's argument that the agents who committed the alleged predicate acts are not controlled

by Mayflower because they "are all independent corporations, incorporated in different states, with different ownership from Mayflower" and because "[t]here is no evidence in the record of any relationship between the members of the Mayflower-enterprise . . . no shared ownership and no shared employees" (Def.'s Reply at 10) (citing Pl.'s Opp'n at 7, 12) is also at odds with Mayflower's argument, discussed above, that the affiliates are acting as Mayflower's agents. And, significantly, Mayflower recruits and has the power to admit affiliates at will and, when dissatisfied, end its relationship with an affiliate "without cause." (Agency Agreement at 6; Webb Dep. at 173, 177.) Mayflower's role in the enterprise therefore goes far beyond the mere giving of directions or performance of tasks helpful to the enterprise. Indeed, without Mayflower's involvement, it appears the enterprise would fail to exist altogether.[20] Thus, the evidence produced suggests that Mayflower participates in the enterprise's operation and "t[akes] some part in directing [the enterprise's] affairs." *Goren*, 156 F.3d at 728 (citing *Reves*, 507 U.S. at 179 n. 3); *see also Swan*, 250 F.3d at 498 (quoting *Reves*, 507 U.S. at 179). Mayflower is not the "complete outsider" that the operation or management test seeks to exclude. *See Reves*, 507 U.S. at 185. Accordingly, summary judgment cannot be granted on this ground, either.


B.     **Pattern of Racketeering Activity**

Liability under RICO also depends on a showing that Mayflower engaged in a "pattern of

---

[20] *Emery*, another case cited by Mayflower, is also distinguishable. In *Emery*, the Seventh Circuit affirmed the dismissal of the complaint and noted that the individual defendants were not alleged to *control* or *direct* the corporation that allegedly committed the RICO violation; rather, the defendants were alleged merely to have *devised* the fraud. 134 F.3d at 1325. Here, in contrast, the evidence indicates that Mayflower plays a major role in directing the affairs of the enterprise, and it did not merely devise the alleged RICO violations.

racketeering activity." 18 U.S.C. § 1962(c). In *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 238 (1989), the Supreme Court established that a pattern of racketeering activity requires more than simply a certain number of predicate acts. The Court determined that, although at least two "predicate acts" are necessary, they may not be sufficient. *Id.* at 237 (quoting *Sedima*, 473 U.S. at 496 n. 14). The Court further stated that "[a] pattern is not formed by sporadic activity," but that a plaintiff must show "that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *H.J. Inc.*, 492 U.S. at 239 (quotation omitted). The "pattern" requirement thus contains both a relatedness and a continuity component. To demonstrate a pattern of racketeering activity under RICO, a plaintiff must prove: (1) two or more predicate acts; (2) that are related; and (3) that involve either a closed period of repeated conduct (closed-ended continuity) or present the threat of repetition in the future (open-ended continuity). *Corley v. Rosewood Care Center, Inc. of Peoria*, 142 F.3d 1041, 1048 (7th Cir. 1998).

Mayflower argues that Chen cannot establish a "pattern of racketeering activity" as required under § 1962(c) because she cannot satisfy either the relatedness or the continuity component. (Def.'s Mot. ¶ 2; Def.'s Mem. at 3, 13-18.)

### 1. Relatedness

The relatedness component is established when the conduct in question "embraces criminal acts that have the same or similar purposes, results, participants, victims or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *H.J. Inc.*, 492 U.S. at 240 (citation omitted).

Mayflower argues that the other shipping transactions identified by Chen do not satisfy the

relatedness component because: "Each incident is highly individualized. Each customer has his or her own individual grievance relating to such different issues as poor service, late deliveries, lost or damaged goods, increases in 'binding' estimates, broken-down trucks, and an assortment of other problems and grievances . . . ." (Def.'s Mem. at 15.) Mayflower acknowledges, however, that "common denominators among these interstate moves are the making of a binding estimate, the subsequent levying of charges for additional services, and the refusal to unload until the charges are paid." (Id. at 15-16.)[21] Chen responds that the predicate acts alleged fall into a similar pattern of bait and switch. (Pl.'s Opp'n at 12-13.) She further asserts that all of the predicate acts involve similar participants, victims, purposes, and methods. (Id. at 12-13.)

This court previously determined that Chen met the relatedness requirements at the pleading stage by describing a bait and switch scheme:

> The purpose and result is to obtain monies in excess of the original estimates by holding the individual's property until the individual pays the additional amounts. The method is to obtain the individual's property and subsequently demand additional amounts for claimed additional services, refusing to release the property until the amounts are paid.

Chen, 159 F. Supp. 2d at 1111. See also Corley, 142 F.3d at 1050 (stating that bait and switch scheme involving substantial number of victims experiencing distinct injuries establishes a pattern of racketeering activity under RICO). Now, Chen has produced sufficient evidence supporting her allegation that Mayflower was conducting (or participating in the conduct of) the enterprise's affairs, i.e., the bait and switch scheme in which the purpose was to obtain monies in excess of the original

---

[21]     Mayflower argues that "[t]hat commonality is not enough [to establish a pattern of racketeering activity] because . . . the acts in question are not criminal in nature." (Def.'s Mem. at 16) (emphasis omitted). The issue of the criminality of the predicate acts alleged will be addressed below.

estimates by holding the shippers' property until additional amounts were paid. Moreover, the evidence produced shows that the predicate acts alleged by Chen are sufficiently related. They have similar participants: Mayflower and the affiliated local moving companies. (Pl.'s LR Resp. ¶ 3.) They have similar victims: individual shippers conducting interstate moves of their household goods. They have similar purposes and results: to obtain money in excess of the shipper's original estimate by refusing to move or unload the shipper's property until the shipper pays the additional amount. (Webb Dep. at 65-68, 71-72, 80-81, 121-22; Reece Dep. at 21-23; Def.'s LR Resp. ¶ 24.) And they have similar methods: bait the shipper with false promises that the cost of the move will not exceed a set price and then, at a point of maximum leverage, demand additional money from the shipper. (Reece Dep. at 15, 21-23; Webb Dep. at 71, 80-81, 85; Def.'s LR Resp. ¶ 17; Witherington Dep. at 215; Fleming Dep. at 265-66.) Thus, Chen has established predicate acts that have "the same or similar purposes, results, participants, victims or methods of commission." *H.J. Inc.*, 492 U.S. at 240 (citation omitted). Mayflower's argument that the various transactions identified by Chen are not related because the "individual grievance[s]" made by the shippers "relat[e] to such different issues" (*e.g.*, increases in binding estimates, poor service, late deliveries, lost or damaged goods, and broken-down trucks) (Def.'s Mem. at 15) is unpersuasive in light of the similarities in the participants, victims, purposes, results and methods discussed above. Thus, summary judgment cannot be granted on this basis.

### 2.    *Continuity*

To establish a RICO pattern "it must also be shown that the predicates themselves amount to, or . . . otherwise constitute a threat of, *continuing* racketeering activity." *H.J. Inc.*, 492 U.S. at

240. The "continuity" requirement "is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.* at 241 (citation omitted).

### a. Closed-ended Continuity

Closed-ended continuity may be demonstrated by "a series of related predicates extending over a substantial period of time." *Id.* at 242. "Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement . . . . " *Id.* Historically, the Seventh Circuit looked at the following factors to determine whether closed-ended continuity was established: (1) the number and variety of predicate acts; (2) the time period over which the predicate acts were committed; (3) the number of victims; (4) the presence of separate schemes; and (5) the occurrence of distinct injuries. *Corley*, 142 F.3d at 1049 (quoting *Morgan v. Bank of Waukegan*, 804 F.2d 970, 975 (7th Cir. 1986)). Following the Supreme Court's decision in *H.J. Inc.*, the Seventh Circuit has recognized that these factors must be analyzed "with an eye towards achieving a 'natural and common sense' result." *United States Textiles, Inc. v. Anheuser-Busch Cos., Inc.*, 911 F.2d 1261, 1267 (7th Cir. 1990) (quoting *H.J. Inc.*, 492 U.S. at 251 (Scalia, J., concurring)). Those factors will be considered here.

### i. Number and Variety of Predicate Acts

Chen has identified eighteen victims, herself included, of the alleged scheme within a four year period from 1998 to 2001. (Pl's LR App. Exs. 8-23, 25, 31-48; Pl.'s LR Stmt. ¶¶ 58-157; Pl.'s Opp'n at 13-14.) Mayflower argues that Chen has failed to establish closed-ended continuity as she

has identified a low number of predicate acts in comparison to the total number of transactions handled by Mayflower. (Def.'s Mem. at 15.) More specifically, Mayflower contends that Chen's identification of less than twenty instances of misconduct by a company that engages in "approximately 40,000 transactions per year" is insufficient. (Def.'s Reply at 12.) Mayflower argues that, at worst, it is being accused of sporadic criminality, and that if the percentage of transactions test it advocates is not applied, a defendant charged with engaging in a small percentage of illegal transactions "is just as much of a racketeer as one whose transactions are <u>all</u> illegal." (*Id.*)

Mayflower analogizes its position to that of the defendant in *Pizzo v. Bekin Van Lines Co.*, 258 F. 3d 629 (7th Cir. 2001). In that case, the Seventh Circuit stated that "[a] criminal enterprise, as distinct from a normal enterprise that gets into trouble with the law from time to time, is an enterprise that *habitually* resorts to illegal methods of doing business." *Id.* at 633. "Habitual" conduct, however, need not imply a large number of transactions. Rather, it more likely implies "usual" conduct.[22] Significantly, Mayflower does not claim that the alleged predicate acts are "unusual" instances. Rather, it claims that those practices are legal and in compliance with its tariff. (Def.'s Mem. at 19.) Mayflower thus could be expected to engage in the predicate acts habitually, even if not frequently. Moreover, neither *Pizzo* nor any other case cited by Mayflower adopts the percentage of transactions test urged by Mayflower. To adopt such a rule would be to allow large businesses to conduct small scale racketeering without prosecution. RICO, however, applies even when criminal activity makes up only a small portion of the activities of an otherwise legitimate business. *See Fitzgerald,* 116 F.3d at 227 (stating that RICO may be demonstrated in a case "in

---

[22] *See The American Heritage College Dictionary* 609 (3d ed., Houghton Mifflin Co. 2000) (defining "habitual" as: "1.a. Of the nature of a habit . . . . 2. Established by long use; usual.")

which the criminal uses the acquired enterprise to engage in some criminal activities but for the most part is content to allow it to continue to conduct its normal, lawful business–and many of the employees of the business may be unaware that it is controlled and being used by a criminal").

Mayflower also argues, relying on *Hartz v. Friedman*, 919 F.2d 469, 473 (7th Cir. 1990), that "[t]he Seventh Circuit . . . does not look favorably on relying on many instances of mail and wire fraud to form a pattern." (Def.'s Reply at 6.) In *Hartz*, the plaintiff had alleged sixteen telephone calls and mailings related to two alleged schemes, and the court found that continuity was not established. 919 F.2d at 472-473. Similarly, in *Midwest Grinding Co., Inc. v. Spitz*, 976 F.2d 1016, 1024 (7th Cir. 1992), the Seventh Circuit noted that "the volume of mailings" is not dispositive as to pattern. In that case, hundreds of invoices were sent to former customers. *Id.* The court held that the number and variety of predicate acts was lacking in that case because the bulk of the invoices that were sent were directed to only a few customers and were very similar to one another. *Id.* at 1025.

Chen's case is distinct from *Hartz* and *Midwest Grinding*. While those cases involved a small number of victims and transactions, Chen's evidence of continuity comes from a number of bait and switch transactions involving many more victims over several years. *Midwest Grinding* involved a "one shot scheme that lasted, at most, nine months," and invoices that were sent to only "a few customers" and "only one victim." *Id.* at 1024-25. Similarly, *Hartz* involved two victims (the plaintiffs who were husband and wife) and two alleged schemes. 919 F.2d at 473. Unlike the plaintiffs in *Hartz* and *Midwest Grinding*, Chen does not rely on the number of telephone calls or mailings to show continuity. Chen relies on the number of fraudulent transactions that occurred between the enterprise and the various victims. As will be discussed below, each of those transactions produced a separate injury, and the injuries were different from one another. That is

sufficient. *See Ashland Oil, Inc. v. Arnett*, 875 F.2d 1271, 1279 (7th Cir. 1989) (observing that a pattern had been found in an earlier case from multiple mail and wire fraud counts because each instance of fraud produced a distinct injury) (citing *Liquid Air Corp. v. Rogers*, 834 F.2d 1297, 1297 (7th Cir. 1987)).

### ii.  Time Period

Mayflower addresses the duration issue by suggesting that the alleged predicate acts are "sporadic" (Def.'s Mem. at 15), and that Chen's allegations regarding three acts in five years (and as many as 23 acts in ten years) is insufficient. (*Id.* at 17.)  Mayflower further argues that a substantial period of time can work against Chen where only a few isolated incidents occurred during that time. (Def.'s Reply at 14.)

In *Midwest Grinding*, the Seventh Circuit noted that duration of the scheme "is perhaps the closest thing we have to a bright-line continuity test." 976 F.2d at 1024-25. The court drew on *H.J. Inc.*, in which the Supreme Court stated that predicate acts extending over "a few weeks or months and threatening no future criminal conduct" did not satisfy the continuity requirement. 492 U.S. at 242. *See also Pizzo*, 258 F.3d at 633 (stating that two disputes five months apart did not establish a pattern).

Here, the scheme identified by Chen stretches over several years. Chen has produced evidence that the predicate acts (the various alleged fraudulent transactions) spread over a period of at least four years (1998-2001). (Pl's LR App. Exs. 8-23, 25, 31-48; Pl.'s LR Stmt. ¶¶ 58-157; Pl.'s Opp'n at 13-14.)  That time period is significantly greater than the time period in other RICO cases where continuity has been found. *See, e.g., Roger Whitmore's Automotive Servs., Inc. v. Lake*

*County*, No. 99 C 2504, 2002 WL 959587 at *4 (N.D. Ill. May 9, 2002) (Gottschall, J.) (stating that 28 months is a substantial period of time under *H.J. Inc.*); *Sears Roebuck & Co. v. Emerson Elec. Co.*, No. 02 C 5771, 2003 WL 60573 at *4 (N.D. Ill. Jan. 7, 2003) (Kennelly, J.) (single scheme lasting three years was sufficient to withstand motion to dismiss); *United States v. Genova*, 187 F. Supp. 2d 1015, 1028 (N.D. Ill. 2002), *rev'd in part on other grounds,* 333 F.3d 750 (7th Cir. 2003), (multiple predicate acts over course of three years held sufficient); *Esposito v. Soskin*, 11 F. Supp. 2d 976, 982 (N.D. Ill. 1998) (stating that "the predicate acts span nearly six years, well outside the danger zone of one year or less"); *Arenson v. Whitehall Convalescent & Nursing Home*, 880 F. Supp. 1202, 1210 (N.D. Ill. 1995) (complaint established continuity requirement where predicate acts took place over a five year period).

### iii.    Number of Victims

Mayflower also argues that Chen has failed to establish a sufficient number of victims. Mayflower argues that the presence of multiple victims is of little weight in determining the threat of continued multiple activity when the number of predicate acts is not of great variety and there is only one scheme. (Def.'s Reply at 14) (citing *Olive Can Co., Inc. v. Martin*, 906 F.2d 1147, 1151 (7th Cir. 1990)). Mayflower further argues that there are far fewer victims here than in other RICO cases where summary judgment was granted in favor of the defendant. (Def.'s Reply at 14.)

The court in *Pizzo* stated that "two complaints by dissatisfied customers do not add up to a pattern." 258 F.3d at 632. However, in *Corley*, the plaintiffs identified seven other residents (and classes of unidentified residents) that were victims of the defendants' bait and switch and the Seventh Circuit found that the plaintiff sufficiently alleged a pattern of racketeering. 142 F.3d at

1046, 1050. The present case involves eighteen individuals whom a jury could find were victims of a bait and switch scheme. That is enough to demonstrate a pattern provided the other factors are sufficiently met. *See, e.g., Vicom, Inc. v. Harbridge Merchant Servs., Inc.*, 20 F.3d 771, 781 (7th Cir. 1994) (noting that the number of victims factor, "standing alone, is in no way dispositive of whether the predicate acts alleged in the amended complaint can support a finding that continuity exists" because "no one factor [is] necessarily dispositive").

### iv.    Presence of Separate Schemes

Mayflower argues that Chen avers only one scheme: the alleged bait and switch scheme. (Def.'s Reply at 13.) Mayflower further claims that the other alleged schemes of refusing payment by credit card and requiring COD payment still amount to only one scheme. (*Id.*) According to Mayflower, a multiplicity of mailings which are merely part of a single scheme does not establish a pattern of racketeering activity. (*Id.* at 13-14.) Chen identifies the multiple schemes as separate instances in which the victims were required to pay additional amounts ranging from hundreds to thousands of dollars above the estimates they were told would not be exceeded. (Pl.'s Opp'n at 14.)

As a threshold matter, multiple schemes are not required to prove a RICO violation. *H.J. Inc.*, 492 U.S. at 240-41. Proof of multiple schemes is, however, relevant to demonstrating the continuity of racketeering activity. *Id.* at 240. Chen's evidence regarding the separate instances of fraud is sufficient here, whether those instances are deemed to be a single scheme or multiple schemes to defraud shippers. *Oak Park Trust & Savings Bank v. Village of Inverness*, No. 96 C 2896, 1998 WL 341831 at **3-4 (N.D. Ill. June 22, 1998) (Kocoras, J.), a case relied upon by Mayflower, involved only one scheme (an allegedly false representation that certain homes for sale

would be protected by 24-hour security, disseminated by a limited number of mailings and advertisements). Here, however, Chen's evidence of a scheme to defraud shippers does not "revolve[] around one piece of fraudulent misinformation." *Id.* at *4. Rather, each scheme involved its own set of facts – its own victims, its own local moving company affiliates, and its own "bait and switch" tactics (*e.g.*, attempts to obtain additional monies at the point of origin versus the point of destination). Moreover, even if Chen's evidence is construed as being only a single scheme, that fact alone does not preclude her from establishing continuity. *See H.J. Inc.*, 492 U.S. at 240-41. *See also Corley,* 142 F.3d at 1050 (finding that a single bait and switch scheme involving in-numerable predicate acts of mail fraud occurring over a significant period of time, and directed against a substantial number of victims whom experienced distinct injuries, established a pattern of racketeering activity); *Sears Roebuck,* 2003 WL 60573 at *4 (single scheme lasting three years sufficient to withstand motion to dismiss).

### v. Occurrence of Distinct Injuries

Finally, Mayflower argues that Chen's case involves only one type of injury, namely, having to pay more than the guaranteed "not to exceed" amount provided in the binding estimate. (Def.'s Reply at 14.) Mayflower argues that that evidence is insufficient, as Chen is required to establish distinct injuries – or, different types of injuries – rather than multiple instances of the same injury. (*Id.*)

In *Vicom*, the Seventh Circuit recognized that the "distinct injury" element is not established by evidence that identical economic injuries had been suffered over the course of two years stemming from a single contract. 20 F.3d at 782 (citing *United States Textiles*, 911 F.2d at 1269).

41

However, Chen's case is distinguishable. The various injuries established by Chen (*i.e.*, shippers having to pay additional amounts beyond their "guaranteed not to exceed" estimates) are not identical and do not stem from a single contract. They stem from numerous different contracts made over a period of at least four years. Thus, Chen has produced sufficient evidence to establish distinct injuries.

b.    Open-ended Continuity

Open-ended continuity can be established by showing "past conduct that by its nature projects into the future with a threat of repetition." *H.J. Inc.*, 492 U.S. at 241. "[T]he threat of continuity may be established by showing that the predicate acts or offenses are part of an ongoing entity's regular way of doing business." *Id.* at 242. Mayflower argues that Chen "has failed to show any of the circumstances for 'open-ended continuity.'" (Def.'s Reply at 12.) Mayflower also claims that Chen "has failed to establish predicate acts as a *regular way* of conducting an ongoing legitimate business." (Def.'s Reply at 12.) Chen argues that the predicate acts are the regular way in which Mayflower and the other members of the enterprise conduct business. (Pl.'s Opp'n at 14.) Chen points to evidence that members of the enterprise regularly omit from estimates the costs of all services required to move a shipper's goods, without even inquiring about conditions that might lead to additional charges, and that Mayflower makes no effort to curtail the affiliates' practices although Mayflower knows that shippers are misled by the "not to exceed" language. (*Id.*) (citing Webb Dep. at 48-49, 78, 85; Witherington Dep. at 215; Pullaro Dep. at 203-04.) Chen argues that Mayflower's insistence that the enterprise's fraudulent billing practices "have been approved by the United States government" is further evidence that the enterprise will continue to engage in similar conduct. (Pl.'s

42

Opp'n at 14-15.)

Chen has produced sufficient evidence that Mayflower is almost certain to continue to engage in such practices. Mayflower admits that its practices are misleading to shippers (Witherington Dep. at 215; Fleming Dep. at 265-66), but contends that its conduct is lawful and in compliance with its tariff. (Def.'s Mem. at 19.)

The evidence presented by Chen is sufficient to enable a jury to conclude that she has met the closed- and open-ended continuity requirements. Thus, summary judgment cannot be granted on the basis that Chen cannot establish a "pattern of racketeering activity."

### D. The Illegality of the Conduct

Chen alleges acts of mail and wire fraud, extortion, and theft as RICO predicate acts. Mayflower argues that all of the alleged illegal activity is consistent with and in compliance with Mayflower's tariff, as well as federal statutes and regulations, and therefore legal. (*Id.* at 18-23.) In addition, Mayflower argues that Chen cannot establish the predicate acts alleged of mail or wire fraud, as is her burden. (*Id.* at 23-25.)[23]

#### 1. *The Tariff*

Mayflower argues that the conduct complained of in this case (*i.e.*, the misleading estimates, the refusal to accept payment by credit card, and the refusal to unload until full payment is made) has "been approved by the United States government and . . . complied with federal law." (*Id.* at 19.)

---

[23] As discussed further herein, Mayflower does not address the sufficiency of the extortion or theft acts in its Memorandum, although it does address those acts in its Reply.

By that, Mayflower means that its conduct is authorized by its tariff and that its tariff complies with the law. (*Id.* at 19-23.) In addition, Mayflower argues or implies that each allegedly fraudulent practice was disclosed to Chen in advance of her move through the Handwritten and Typed Estimates, the bill of lading, and the "Your Rights and Responsibilities When You Move" and "On The Move With Mayflower Transit" pamphlets. (*Id.* at 20-23.) Chen responds that Mayflower cannot rely on the tariff for the following reasons: (a) the "filed rate doctrine" does not apply to Mayflower's tariff; (b) Chen did not receive sufficient notice of the tariff's provisions; and (c) the conduct complained of is not contained within the tariff (and therefore not authorized by the tariff). (Pl.'s Opp'n at 17-22.) Finally, Chen argues that, even if Mayflower could rely on the tariff, the tariff is unlawful. (*Id.*)

a.     Legal Effect of the Tariff

The first issue to be addressed is what legal effect, if any, Mayflower's tariff has in terms of providing authorization for Mayflower's actions. 49 U.S.C. § 13702(c)(1) provides that a carrier engaged in household goods transportation "shall maintain rates and related rules and practices in a published tariff." That requirement is distinct from the filing requirement that existed under the Interstate Commerce Act ("ICA") until 1995, when the ICC Termination Act was passed (109 Stat. 803 (1995)). Prior to the ICC Termination Act, carriers were required to file their tariff with the Interstate Commerce Commission ("ICC"). *See Security Servs., Inc. v. Chemrex, Inc.*, No. 92 C 4214, 1993 WL 189865 at *2 (N.D. Ill. June 2, 1993) (Bucklo, J.). However, the ICC Termination Act removed the filing requirement for carriers of household goods, although it retained the requirement for carriers engaged in some "noncontiguous domestic trade." 49 U.S.C. § 13702(a)

and (c). *See Opp v. Wheaton Van Lines, Inc.*, 231 F.3d 1060, 1066 n. 2 (7th Cir. 2000) (stating that motor carriers of household goods are no longer required to keep a tariff on file with the ICC); *Rankin v. Right On Time Moving & Storage, Inc.*, No. CIV. 01-45-B-K, 2002 WL 453245 at *6 n. 4 (D. Me. Mar. 25, 2002) (Kravchuk, M.J.) (same) (citing 49 U.S.C. § 13702(a) and (c)). Under § 13702(c)(1), "the tariff must be available for inspection by the [Surface Transportation] Board [("the Board")] and be made available for inspection by shippers upon reasonable request." 49 U.S.C. § 13702(c)(1). "The Board may invalidate a tariff prepared by a carrier or carriers under this section if that tariff violates this section or a regulation of the Board carrying out this section." *Id.* at § 13702(d).

Although the "tariff must be available for inspection by the Board," there is no requirement that it must be approved by the Board prior to publication. *Id.* § 13702(c)(1). Indeed, Mayflower has conceded that it publishes "exceptions" to the tariff without prior approval from the government. (Def.'s LR Resp. ¶ 160.) At most, the tariff is a document that is written by private bodies, is subject to review by the Board at some point after its publication, and *may* be invalidated by the Board if it violates 49 U.S.C. § 13702 or a regulation of the Board carrying out that statute. *See* 49 U.S.C. § 13702(d); 49 C.F.R. § 1310.2(d).[24] Thus, although the tariff is required by the United States Code and the Code of Federal Regulations (the "CFR"), the tariff itself is not a law or a regulation. Mayflower fails to identify any authority suggesting that its tariff carries such weight and admits that it cannot exempt itself from laws and regulations through it tariff. (Def.'s LR Resp. ¶ 162.) Mayflower's argument that any activity that complies with its tariff is automatically legal is therefore

---

[24] Publication is not the sole prerequisite to enforcement of a tariff against a shipper. *See Rankin*, 2002 WL 453245 at *7 n. 6 (noting that moving company failed to establish that its tariff complied with the Board's requirements).

without merit.

Nor is the tariff accorded legal status under the "filed rate doctrine." Under the filed rate doctrine, "provisions in tariffs usually governed whether shippers had actual, constructive, or no notice." *Tempel Steel Corp. v. Landstar Inway, Inc.,* 211 F.3d 1029, 1031 (7th Cir. 2000). However, the ICC Termination Act abolished the tariff filing requirement and the filed rate doctrine, and it cancelled "the legal effectiveness of most extant tariffs." *Id. See also* 49 U.S.C. § 13710(a)(4) ("Any tariff on file with the [ICC] on August 26, 1994, and not required to be filed after that date is null and void on that date. Any tariff on file with the [ICC] on January 1, 1996, and not required to be filed after that date is null and void beginning on that date."). The Seventh Circuit has concluded that the filed rate doctrine is "defunct for motor transport" and that, with respect to most carriers, the "tariffs" are nothing more than contracts and the terms limiting liability are enforceable only if the shippers had actual notice of them. *Temple Steel,* 211 F.3d at 1030-31.

Mayflower publishes rather than files its tariff. (Pullaro Dep. at 168, 173.) The filed rate doctrine does not apply to Mayflower's tariff. Rather, as discussed below, before the tariff may be enforced against Chen, Chen must have received actual notice of the tariff's provisions.

b.    Actual Notice

For Mayflower to enforce the provisions of its tariff, it must give "notice that the tariff is available for inspection in its bill of lading or by other actual notice." 49 U.S.C. § 13702(c)(2); 49 C.F.R. § 1310.2(c). A tariff may be incorporated by reference into a bill of lading or other contract with a shipper, provided that:

The bill of lading or other document must contain a conspicuous notice that the

contract of carriage incorporates the terms of the carrier's tariffs; the carrier must give *notice that its tariffs are available for inspection in its bill of lading* or by other actual notice to individuals whose shipments are subject to such tariffs; and *the carrier must make the full text of incorporated terms readily available for inspection by the shipper*, free of charge, upon request. If such terms cannot be made available immediately, they must be made available promptly and free of charge by mail or other delivery service.

... If the incorporated terms include [limits on the carrier's liability for loss, damage, or delay of goods or rights of the carrier to impose monetary penalties on shippers, increase the price of the transportation, or change any terms of the contract] ... *the shipper must be provided with a brief summary of the principal features of such terms on or with the document* ....

49 C.F.R. § 1310.4(a)(1), (2) (emphasis added). Thus, in *Nematollahi v. Starving Students, Inc.*, No. 01 C 4310, 2002 WL 31006127 at *5-6 (N.D. Ill. Sept 5., 2002) (Manning, J.), the court concluded that actual knowledge of the tariff terms or knowledge of the right to review the tariff were required in order for the terms of the tariff to be binding.

Mayflower argues or implies that Chen and the other alleged RICO victims received notice of the conduct complained of through the estimates, bills of lading and pamphlets ("Your Rights and Responsibilities When You Move" and "On the Move with Mayflower Transit"). (Def.'s Mem. at 20-23.) Chen argues that she (and some of the other shippers) did not receive sufficient notice of the tariff's provisions. (Pl.'s Opp'n at 19.)

The notice required by the CFR is not sufficiently provided in either the Handwritten or Typed Estimates or the bill of lading. Although the Handwritten Estimate states that it incorporates by reference the "rules, rates and form of Bill of Lading in Carrier's Tariff on file with the Surface Transportation Board" (Handwritten Estimate at 2), Mayflower has stated that it does not file its tariff with the Surface Transportation Board. (Pullaro Dep. at 168, 173.) Moreover, there is no notice regarding the shipper's right to inspect the tariff in the Handwritten or Typed Estimates.

(Handwritten Estimate at 1-2; Typed Estimate at 1-2.)

The bill of lading is more comprehensive on this issue, and states, in part:

> Mayflower Transit, Inc. publishes tariffs which set forth the terms, conditions and prices for the transportation services it provides. The applicable tariff provisions are incorporated herein by reference. Incorporated provisions include, but are not limited to: . . . (3) Reserving the carrier's right to assess additional charges for additional services performed . . . . For more information, please see the terms and conditions printed herein and in the carrier provided booklet "Your Rights and Responsibilities When You Move." The tariff is available for inspection at the offices of Mayflower Transit, Inc., or, on request, carrier will furnish a copy of any tariff provision containing carrier's rates, rules or charges governing the shipment . . . .

(Bill of Lading at 2.) Under the CFR regulations mentioned above, Chen was required to have been provided with a "brief summary of the principal features" of the tariff's terms including the "rights of the carrier to impose monetary penalties on shippers or increase the price of transportation." 49 C.F.R. § 1310.4(a)(2)(iii). Chen asserts that she never received a copy of the pamphlet "Your Rights and Responsibilities When You Move." (Chen Dep. at 215.)[25] Because Chen did not receive a copy of that pamphlet, she was not provided the required notice.[26]

---

[25] Mayflower disputes that Chen was not provided a copy of the "Your Rights and Responsibilities When You Move" pamphlet. Because Mayflower has not provided evidence eliminating a question of fact on this point, for purposes of this motion, the court will accept Chen's version of the facts on this issue because she is the non-movant. *Anderson*, 477 U.S. at 255.

[26] Had Chen received the pamphlet, it would not necessarily have warned her of the possibility of charges in addition to the "not to exceed" estimate of $1,741.89, or of the possibility that her credit card would not be accepted. The pamphlet makes no reference to the phrases "not to exceed" or "guaranteed not to exceed." Considering the Typed Estimate that Chen received in light of the pamphlet's description of "Binding Estimates of Total Cost" quoted in footnote 11, *supra*, one might reasonably interpret the listing of "Total of Bound Services" ($1,385.19) as the "binding estimate" referred to in that description, and the listing of "Total of Non-Bound Services" ($356.70) as the "more services than those included in the estimate" for which the mover may demand full payment at the time of delivery. Likewise, the pamphlet does use the term "pre-approval" of credit card payment. Instead it states that the shipper must pay by cash, certified check, traveler's check or bank check, "unless the mover agrees before you move

48

Moreover, as mentioned, the carrier is required to "make the full text of incorporated terms readily available for inspection by the shipper, free of charge, upon request. If such terms cannot be made available immediately, they must be made available promptly and free of charge by mail or other delivery service." 49 C.F.R. § 1310.4(a)(1). Chen has produced evidence that casts doubt on whether Mayflower met that requirement. Specifically, Chen did not receive the bill of lading until after her goods had been loaded. (Def.'s LR Resp. ¶ 45.) Such delivery is untimely pursuant to the "Your Rights and Responsibilities When You Move" pamphlet, which states: "The driver who loads your shipment must give you a copy of the bill of lading *before* loading your furniture." ("Your Rights and Responsibilities When You Move," Form OCE-100 at 4) (emphasis added.) Moreover, it is seriously questionable whether the driver would have been able to produce the tariff if Chen had requested a copy of it at that time. Thus, Chen's right to inspect the tariff may have been illusory. Additionally, even if the tariff had been made available to her on the day of shipment, the right to inspect a lengthy and complex document while a driver is waiting to depart does not appear to comport with the intent of the CFR regulations, particularly given the requirement that the tariff be provided "promptly," indicating an intent to give shippers the opportunity to study the tariff prior to their shipment. 49 C.F.R. § 1310.4.

Thus, Chen has established facts which could permit a jury to conclude that she did not receive the notice required under the CFR to make Mayflower's tariff effective.

---

to extend credit or to accept payment by charge card." ("Your Rights and Responsibilities When You Move," Form OCE-100 at 2.) A reasonable interpretation of the letter Chen received from Admiral is that Admiral agreed to accept payment by charge card.

c.    Activities Authorized by the Tariff

Most importantly, even if Chen had been given proper notice of the tariff, the tariff's terms do not explicitly permit the activities identified by Chen as RICO predicates. Item 400 of the 104-F Exceptions tariff (the one specific to Mayflower) provides that "[u]pon request . . . carrier will provide a Predetermined Price, in writing, for the total charge for transportation and other services pertaining to a shipment . . . ." (Def.'s LR App. Ex. (C)4, Tariff No. 104-C.)  That term is subject to a note which states that the charges listed in the Predetermined Price are limited to the origin and destination and additional stops, if any, indicated on the Predetermined Price. (*Id.*)  Item 408 of the Exceptions to the Tariff 400 Series states that payment by credit card is "subject to authorization from the appropriate credit card company . . . prior to the acceptance of the shipment by the carrier." (Def.'s LR App. Ex. C(3), Item 408 of Tariff No. 104-F.)  Item 20 states that "[t]he carrier will not deliver or relinquish possession of any property transported by it until all tariff rates and charges thereon have been paid . . . ." (Def.'s LR App. Ex. C(4), Item 20 of Tariff No. 400-M.)  Mayflower relies on those provisions to show that it was allowed to impose additional charges beyond the "guaranteed not to exceed" estimate, to require shippers to obtain pre-approval before allowing them to pay by credit card, and to refuse to release a shipper's goods until the entire amount charged has been collected. (Def.'s Mem. at 19-22.)  Chen argues that none of that conduct is contained in (and thus authorized by) the tariff. (Pl.'s Opp'n at 17-19.)

No section of the tariff submitted by Mayflower specifically addresses the "guaranteed not to exceed" language handwritten on Chen's Handwritten Estimate.   The tariff refers to "Predetermined Price," but does not equate that term with the term "guaranteed not to exceed" or discuss how a representation of "guaranteed not to exceed" relates to "Predetermined Price."   Nor

50

does any section of the tariff identified by the parties address the language in the letter from Admiral to Chen stating that payment could be made by "Major Credit Card," without further reference to the need for "pre-approval." (Admiral Letter to Chen.)[27] Mayflower argues that "the Admiral letter does not purport to supersede the Estimate . . . ." (Def.'s Mem. at 22.) However, Chen apparently received the Admiral letter after she received the Handwritten Estimate.[28] Nor does any section of the tariff address the various oral statements allegedly made to Chen which promised her that her move would not cost more than the guaranteed not to exceed amount provided in the Handwritten Estimate, or Chen's contention that Mayflower attempted to charge for amounts beyond that to which it was lawfully entitled by the tariff. None of the practices that Chen claims enable the scheme, including fraudulently concealing from shippers that the estimate fails to include necessary services that would likely affect the estimate price, appear to be authorized by the tariff. Similarly, the tariff does not permit the carrier to retain possession of the goods to obtain payment to which it is not entitled. At most, it may retain goods until it is paid the money that is owed under the tariff agreement. Thus, the terms of the tariff do not necessarily authorize the conduct identified by Chen as RICO predicates.[29]

---

[27] While the Admiral letter to Chen references the need for an "approved letter of authorization and approved credit check," that reference applies to situations when a shipper pays by "direct billing to [the shipper's] company." (Admiral Letter to Chen) (emphasis omitted.)

[28] It appears that Chen received the letter around June 7 or 8 based on her testimony that she made the decision to use a credit card on about June 7 or 8 and her decision was prompted by the letter she received from Admiral. (Chen Dep. at 203.) Chen received the Handwritten Estimate on June 4, 1999. *See* Def.'s LR Stmt. Supp. Def.'s Mot. Summ. J. Pendent Cts. 2nd Am. Compl., Ex. B. [Dkt 74.]

[29] Because there is a genuine issue of material fact on this issue precluding summary judgment, it is not necessary to address Chen's final argument that the tariff itself is unlawful.

2. *Existence of a Predicate Act*

Chen alleges three types of predicate acts: mail and wire fraud, extortion, and theft from interstate commerce. (Pl.'s Opp'n at 22.) Mayflower argues that Chen cannot establish the predicate acts of mail and wire fraud. (Def.'s Mem. at 18-19, 23-25.)

a. Mail and Wire Fraud

To prove mail or wire fraud, it must be shown that: (1) the defendant participated in a scheme to defraud; (2) the defendant had the intent to defraud; and (3) the mails or wires were used in furtherance of the scheme. *United States v. Montani*, 204 F.3d 761, 769 (7th Cir. 2000) (mail fraud); *United States v. O'Brien*, 119 F.3d 523, 532 (7th Cir. 1997) (quotation omitted) (wire fraud). Mayflower argues that Chen cannot establish that any false statements of material fact were made to her, that Mayflower participated in a "scheme to defraud" based on the not to exceed estimates, or that there was a specific intent to defraud. (Def.'s Mem. at 23-25.)

i. False Statements

Mayflower argues that "the 'guaranteed not to exceed' or 'binding' estimates involve–at best–promises of *future* action, which do not qualify as statements of material fact required to establish mail or wire fraud." (*Id.* at 23). At common law, a breach of a promise of future action sounds in contract rather than fraud. *Perlman v. Zell*, 938 F. Supp. 1327, 1339 (N.D. Ill. 1996). However, to establish mail fraud, "it is not necessary to establish, as it is in the case of common law fraud, that there was a misrepresentation of present fact." *Richards v. Combined Ins. Co. of Am.*, 55 F.3d 247, 252 (7th Cir. 1995) (noting that a scheme to defraud by means of false pretenses and

promises is within the scope of RICO liability for mail fraud); *see also Corley*, 142 F.3d at 1045, 1051 (promises regarding future care in nursing home sufficient to allege RICO predicates). Rather, it is necessary to establish a scheme to defraud and the intent to implement such a scheme. *Richards*, 55 F.3d at 252. As discussed below, Chen has established facts sufficient to meet that requirement.

  ii. Scheme to Defraud and Intent to Implement Scheme through Mail and Wire Fraud

  As mentioned above, mail fraud requires the intent to implement a scheme to defraud. *Id.* The "scheme or device" requirement "is broad, and has even been viewed as swallowing the rule barring promissory fraud actions." *Bower v. Jones*, 978 F.2d 1004, 1011 (7th Cir. 1992).

  Mayflower argues that Chen cannot establish a specific intent to defraud. (Def.'s Mem. at 24.) It is the rare case in which a plaintiff is able to produce direct evidence of intent to defraud. *In re Healthcare Compare Corp. Secs. Litig.*, No. 93 C 1970, 1993 WL 616683 at *11 (N.D. Ill. Nov. 19, 1993) (Bobrick, M.J.). As Chen observes, however, specific intent to defraud "may be established by circumstantial evidence and by inferences drawn from examining the scheme itself which demonstrate that the scheme was reasonably calculated to deceive persons of ordinary prudence and comprehension." *United States v. Paneras*, 222 F.3d 406, 410 (7th Cir. 2000) (quoting *U.S. v. LeDonne*, 21 F.3d 1418, 1426 (7th Cir. 1994)). In addition, fraudulent intent can be demonstrated by a breach that follows so closely on the heels of a promise that the intent not to keep the promise may be inferred. *AAR Intl., Inc. v. Vacances Heliades, S.A.*, 202 F. Supp. 2d 788, 798-99 (N.D. Ill. 2002) (citation omitted). A scheme to defraud can be found when "the broken promise is 'embedded in a larger pattern of deceptions or enticements that reasonably induces reliance and against which the law ought to provide a remedy.'" *Id.* at 799 (quoting *Desnick v. American Broad.*

*Cos., Inc.*, 44 F.3d 1345, 1354 (7th Cir. 1995)).

Chen has established circumstantial evidence that would support an inference of intent to defraud. Specifically, she signed an agreement stating that the cost of her move was "guaranteed not to exceed" the price provided on the Handwritten Estimate. She produced evidence that she was told her move "would not go above" $1,794.89. Although the enterprise intended to charge her for any additional services that might be required, and actually included some charges for both origin and destination services in her Handwritten and Typed Estimates, it did not discuss or resolve with Chen other conditions at her destination that might require additional charges. Mayflower and the affiliates know that some shippers are confused by the use of the phrase "not to exceed" or similar language, yet continue to provide estimates with those terms. (Witherington Dep. at 215; Fleming Dep. at 265-66; Def.'s LR Resp. ¶ 20.) The enterprise then demanded an amount in excess of not only the estimates but the rates provided in the tariff before it would release Chen's goods. A reasonable jury could infer intent to defraud based on the pattern of conduct identified by Chen.

Mayflower argues that it lacks a financial motive to engage in deception (undercutting any inference of intent to defraud), as all of the charges for destination services are distributed to the affiliates who provide the service. (Def.'s Mem. at 24.) Mayflower, however, benefits from the conduct established by Chen. Mayflower benefits from the enterprise's conduct of issuing fraudulently low estimates because those estimates convince more shippers to do business with Mayflower and Mayflower takes a portion of the line haul charges paid by such shippers. (Def.'s LR Resp. ¶ 16; Reece Dep. at 14; Fleming Dep. at 37-39.) Mayflower also benefits from the enterprise's conduct because the added income provided to the affiliates likely makes it easier for Mayflower to recruit and retain affiliates. (Def.'s LR Resp. ¶¶ 9, 10, 16, 38; Webb Dep. at 173, 176-

78, 182.)

In *Richards*, the defendant was alleged to have committed mail and wire fraud based on its failure to return automatically unearned insurance premiums. 55 F.3d at 248-49. The Seventh Circuit noted that, although the district court found that the defendants were "preying on the consumers' inattention," that fact did not establish a scheme to defraud by means of mail or wire. *Id.* at 250 (citations omitted). The Seventh Circuit also turned to the text of the insurance certificates and found that the relevant certificates contained no "misstatements of fact or intent." *Id.* at 252. The court further noted that an examination of the "transaction as a whole" also failed to support the plaintiff's claims. *Id.* The facts established in the present case are different. Chen has produced evidence showing that she did not simply fail to read the terms of the Handwritten Estimate (and was therefore inattentive), but that members of the enterprise made clear misrepresentations or lies about the effect of the agreement, *e.g.*, Admiral, using Mayflower's interstate authority, told her that the cost of her move would not exceed the "guaranteed not to exceed" amount. There is thus more than the "[m]ediocre or sloppy business practices" that existed in *Richards*. *Id.* at 253. A jury could find that the acts in Chen's case amounted to "'acts of deceit or chicanery,'" as required by *Richards*. *Id.* (quoting *McDonald v. Schencker*, 18 F.3d 491, 495 (7th Cir. 1994)).

Mayflower also attempts to place itself within the scope of *United States v. Bethea*, 672 F.2d 407 (5th Cir. 1982). (Def.'s Mem. at 24-25.) Although *Bethea* involved a charge of a RICO violation against a moving company, the facts were quite different. 672 F. 2d at 412. The defendants in *Bethea* were charged with engaging in a scheme to defraud the government by over-charging for moving and storage needs of armed service members. *Id.* at 409. Specifically, the defendants allegedly caused a particular type of storage to be authorized without the knowledge or

request of the service member, which was arguably contrary to regulation. *Id.* at 410. However, the Fifth Circuit reversed the criminal convictions of the defendants because the "evidence supporting the existence of a scheme to defraud [was] also strongly consistent with innocent activity." *Id.* at 412. The court further noted that, although the storage authorizations were made without requests from service members, they did serve the service members' needs and "thereby furthered the best interests of the member and the Government." *Id.* In contrast, reading the facts in this case most favorably to Chen, the use of deceptive language is not consistent with innocent activity, and the additional charges did not serve Chen's needs. *See DeJohn v. The TV Corp. Intl.*, 245 F. Supp. 2d 913, 919 (C.D. Ill. 2003) (deceptive language one element of an unenforceable adhesion contract).

Finally, Mayflower asserts again that it acted "in complete compliance with the law" because it did not depart from its tariff or applicable federal statutes and regulations, and it "did exactly what it told [Chen] it would do." (Def.'s Mem. at 25.) However, as demonstrated by the above discussion, Chen has established facts from which a reasonable jury could conclude to the contrary.

### b.   *Extortion and Theft*

Mayflower argues that it is "required *by statute* [49 U.S.C. § 13707] to withhold delivery until payment is made." (Def.'s Mem. at 22) (emphasis in original.) There is no suggestion in that statute, however, that the term "payment" refers to anything other than payments *properly* due, as opposed to payments improperly due, as Chen argues were imposed. *See In re e.Spire Communs., Inc.*, 293 B.R. 639, 643-644 (Bankr. D. Del. 2003) (holding mechanic's lien invalid in part because

56

it was knowingly filed for an amount in excess of the amount actually owed).[30]  Beyond that argument and the arguments based on the tariff discussed above, Mayflower did not argue in its Memorandum that Chen's evidence of extortion and theft is insufficient.  In its Reply, following prompting by Chen, Mayflower argued that Chen cannot establish extortion because there is no evidence of "threatened force or violence, [or of] any intent to put [Chen] or anyone else in fear," or theft because "there is no evidence that Mayflower engaged in . . . 'stealing.'"  (Def.'s Reply at 6.)  Arguments not raised in opening briefs are waived.  *See Wilson v. O'Leary*, 895 F.2d 378, 384 (7th Cir. 1990) (stating that "[w]e have consistently refused to consider arguments withheld until the reply brief" and citing cases dating back to 1957).  Mayflower has not suggested why an exception to that rule would apply in the present case.

Thus, Mayflower has not established that summary judgment should be awarded because a predicate act was lacking.

## II.    Mayflower's Motion to Strike

Mayflower has moved to strike Exhibit 50 to Chen's LR 56.1 statement. [Dkt 113.]  Exhibit 50, as characterized by Chen, "is a series of eleven criminal indictments of moving companies which have engaged in 'bait and switch' schemes similar to those at issue in the present litigation" (the "Indictments").  (Pl.'s Resp. Mot. Strike at 1-2.)

Mayflower argues that the documents are not relevant within the meaning of Federal Rules

---

[30]  As discussed above, on the day of delivery, Century's representative, Vinyard, demanded cash payment of $2,641.19 to unload, and then informed Chen that because Chen's goods were being put into storage, the total charges would be $5,122.83.  Mayflower subsequently admitted that even after 97 days of storage, the total charges for Chen's move, including the disputed amounts, were $3,521.28.

of Evidence 401 and 402, or are inadmissible hearsay. (Def.'s Mot. Strike at 2-4.)[31] Chen asserts that the Indictments are not being offered to prove the truth of the matter contained therein, but are being offered to show that the conduct identified in her RICO claim constitutes indictable activities, *i.e.*, criminal conduct that is not *"per se* legal," as Mayflower argues. (*Id.* at 2, 4.)

While Chen is correct in asserting that she must demonstrate that the acts identified as RICO predicates are indictable offenses (*see Bankcard Am., Inc. v. Universal Bancard Sys., Inc.*, 203 F.3d 477, 485 (7th Cir. 2000)), Exhibit 50 is not probative in establishing that conclusion. As Mayflower points out in its motion, "an indictment is nothing but an allegation by a prosecutor, with the review . . . of a grand jury. It is not a judicial decision . . . and in itself proves nothing." (Def.'s Mot. at 3.) The indictments do not prove that any of the conduct described therein actually occurred or that, if it did occur, the conduct was criminal. *See U.S. v. Edwards*, 111 F. Supp. 2d 1057, 1061 (E.D. Wis. 2000) (holding that whether an indictment successfully charges a federal offense is a question of law). Whether the predicate acts alleged in Chen's complaint constitute criminal activity is a question of law, and questions of law are not a proper subject for evidentiary proof. *See Pfeil v. Rogers*, 757 F.2d 850, 862 (7th Cir. 1985) ("Because legal argumentation is an expression of legal opinion and not a recitation of a 'fact' to which an affiant is competent to testify, legal argument in an affidavit may be disregarded."); *Salamanca v. Robert Half Corp.*, No. 02 C 5033, 2003 WL 1825561 at *2 (N.D. Ill. Apr. 4, 2003) (Conlon, J.) (striking legal argument in L.R. 56.1 statement); *Heritage Mutual Ins. Co v. Advanced Polymer Tech., Inc.*, 97 F. Supp. 2d 913, 922 n. 6 (S.D. Ind.

---

[31] Mayflower argues that the "Public records and reports" hearsay exception contained in Federal Rule of Evidence 803(8) is inapplicable because "[a]n indictment is neither a report, a statement, a data compilation, nor a finding of fact." (Def.'s Mot. Strike at 2-3.) It is unnecessary to resolve this argument because the indictments are excluded on relevance grounds, as discussed further herein.

2000) (refusing to admit "legal opinions and analysis" by expert at trial). Mayflower's Motion to Strike is granted.

### III.  Chen's Motion to Strike

Chen has moved to strike the affidavits of Joseph M. Harrison and Thomas E. Duwel and portions of the affidavits of Sonja Pullaro and Terry Webb. (Pl.'s 2nd Mot. Strike at 2-9.) [Dkt 108.] Chen argues that Harrison and Duwel were not properly disclosed as required by Rule 26(a)(1). (*Id.* at 2-6.) Chen further argues that portions of all four affidavits constitute improper legal conclusions. (*Id.* at 2-9.) Chen's arguments have force. Under Federal Rule of Civil Procedure 37(c)(1), witnesses that have not been disclosed cannot testify at trial. Fed. R. Civ. P. 37(c)(1). As discussed above, legal arguments in affidavits are not admissible evidence. It is doubtful that Mayflower properly responded to the court's prior ruling striking earlier versions of those affidavits and stating that "[t]he legal effect of [the] tariffs is something that needs to be argued" as a question of law. (Pl.'s 2nd Mot. Strike, Ex. A, Apr. 14, 2003 Tr. Oral Arg. at 15.) However, the court has disregarded any improper legal argument in the affidavits in deciding Mayflower's motion for summary judgment. Therefore, Chen's motion to strike is denied as moot. *See Randall v. Unitech Sys., Inc.*, 243 F. Supp. 2d 822, 825 n. 2 (N.D. Ill. 2003) (denying as moot a motion to strike because "[i]n granting the defendant's motion for summary judgment, the court did not consider this evidence").

### CONCLUSION

For the reasons discussed above, Mayflower's Motion for Summary Judgment is denied,

Mayflower's Motion to Strike is granted, and Chen's Motion to Strike is denied as moot.

IT IS SO ORDERED.

Geraldine Soat Brown
United States Magistrate Judge

March 11, 2004